# EXHIBIT B

**Capital Reporting Company**

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                    DISTRICT OF COLUMBIA

3      ------------------------------:

    PAULA PAGONAKIS,                  :

4                                     :

         Plaintiff,                   :

5                                     :

           v.                         :    Case No.:

6                                     :    06-027

    EXPRESS, LLC, a/k/a               :

7    LIMITED BRANDS, INC.,            :

                                      :

8        Defendant.                   :

                                      :

9      ------------------------------:

10                               Washington, D.C.

                                 November 20th, 2006

11

12   Deposition of:

13                 PAULA PAGONAKIS,

14          Called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the offices of Bailey

16   & Ehrenberg, PLLC, 1155 Connecticut Avenue, N.W., Suite

17   1100, Washington, D.C., beginning at 1:00 p.m, before

18   Teague Gibson of Capital Reporting, a Notary Public.

19

20               *    *    *    *    *

21

22

# Capital Reporting Company

Page 7

1   else's fault.  They rant into me and it got into

2   litigation.

3        Q    Did you have any continuing injuries from

4   your first auto accident?

5        A    There was, I believe, some damage to veins

6   in my leg, something that was said to be permanent

7   but I don't notice any problems from it.  I think

8   there was some crushed vein or something, I'm not

9   remembering exactly, but I didn't have really -- I

10  don't have anything that I feel or anything with

11  my -- I don't have any problems from that.

12       Q    So as far as you know from 2003 forward

13  you haven't had any lingering affects from your

14  first auto accident?

15       A    Not that I recall, no.

16       Q    The second one you recall more of?

17       A    Yes.

18       Q    When did that approximately take place?

19       A    That date you just said in 2005, I believe

20  it was April.

21       Q    1995 or?

22       A    I mean 1995.

**Capital Reporting Company**

Page 11

1     Q    And what are those?

2     A    I have a traumatic brain injury.  I have

3  inner ear damage.  I have cognitive processing

4  difficulty.  I have equilibrium problems.  I have

5  functional vision problems.  I have fibromyalgia and

6  I have persistent back and neck pain.

7     Q    Anything else?

8     A    That's what I can remember right now.

9     Q    Have these been ongoing since 1995?

10    A    Yes.

11    Q    Continuous?

12    A    Yes, all permanent.  I also have

13  difficulty with short-term memory.

14    Q    Aside from the two auto accidents and this

15  lawsuit have you been involved in any other ·

16  litigation?

17    A    No.

18    Q    Do you remember filing any charges for

19  Workers' Compensation injuries for any employer?

20    A    I don't recall any.

21    Q    Don't recall filing any -- you understand

22  what Workers' Compensation is?

**Capital Reporting Company**

Page 14

1    for a short period while they found their permanent

2    career jobs.

3        Q    What's a short period, how long?

4        A    I don't know, six, eight months and I'm

5    kind of guessing, definitely less than a year, six

6    months.

7        Q    Since January 1, 2004 has anyone, your

8    sons or anyone else, lived with you or your husband?

9        A    One of my sons is a daughter.

10        Q    Aside from your two children has anybody

11    lived with you and your husband?

12        A    No.

13        Q    They lived with you in 2003, right?

14        A    I believe it carried into, I'd have to

15    check when they got their jobs because that was the

16    Fall of 2003, so I believe they might have still

17    been with me a few months into 2004 as well.

18        Q    Why did you leave Canton, Ohio to move to

19    Delaware?

20        A    My husband's job took us there.

21        Q    What's your husband's job?

22        A    At that time or now?

## Capital Reporting Company

Page 31

1      A    Well, I've been working hard at trying to

2  put a work life back together and I have some

3  continuing obstacles and some depression issues.

4      Q    What was Dr. Paviour's expertise in?

5      A    Talk therapy, I believe, would be the

6  answer to that.

7      Q    Where was he located, Virginia or

8  Delaware?

9      A    In Virginia.

10      Q    The first time you saw him was

11  approximately when?

12      A    I don't recall.

13      Q    If you moved to Virginia September 2005

14  did you immediately go or when?

15      A    No, because I had spent some time trying

16  to be employed before I was discouraged to the point

17  to seek help.

18      Q    So just so I understand.  You leave

19  Express, you resign approximately March 2004, do you

20  agree with that?

21    MR. EHRENBERG:  Object to the form, you can

22  answer.

**Capital Reporting Company**

Page 32

1      A     Yes.

2      Q     From that point until you leave Delaware

3   you're seeing on an as needed basis just a family

4   physician, right?

5      A     That's the best of my memory.

6      Q     When you moved to Virginia you decided to

7   see a therapist, why did you start seeing a

8   therapist?

9      A     I explained that.

10     Q     I don't understand.  Is it because you

11   couldn't find another job?

12     A     I'm trying to find meaningful employment

13   so that I can contribute to society and feel

14   fulfilled.  When I try to apply or interview or find

15   something I have obstacles that don't — that get in

16   my way of presenting myself to my best assets.

17     Q     When you say obstacles what do you mean?

18     A     I have a lot of self confidence issues.  I

19   worry about getting harassed again for things I

20   can't do instead of what I can contribute.  I worry

21   that somebody might see that I need some

22   accommodations and hold that against me because it's

## Capital Reporting Company

Page 35

1    medication.

2        Q    So he's not a doctor?

3        A    I don't know, don't remember if he's a

4    doctor.  He's got a doctorate of something

5    obviously.

6        MR. CAMPBELL:  Do we have all the therapist

7    records?

8        MR. EHRENBERG:  We have his records.  Those are

9    the ones I told you we are waiting for.  We have

10   them now.  We need to get them copied and labeled

11   but we have those.

12       MR. CAMPBELL:  Are you going to give them to me

13   today?

14       MR. EHRENBERG:  No, we had talked about this.

15       MR. CAMPBELL: ·We'll have to just plan on

16   coming back I guess with the therapist about that.

17       MR. EHRENBERG:  We had discussed this and we

18   said we are waiting for additional documents dealing

19   with the treatment. ·

20       MR. CAMPBELL:  Yeah, I said we could go today.

21       MR. EHRENBERG:  That were towards mitigation

22   and you said you didn't feel you needed those before

**Capital Reporting Company**

Page 43

1    organization called SCORE.

2        Q    What have you done with SCORE?

3        A    I consult small businesses.  I'm a

4    consultant for small businesses.

5        Q    How long have you been with SCORE?

6        A    Over two years, maybe three, I'm not sure.

7        Q    You started in Delaware and transferred

8    that relationship to Virginia?

9        A    Yes.

10        Q    How much work do you do with SCORE?

11        A    That's totally dependent upon the needs of

12    the people who come to help for the organization and

13    the time I have to devote to that.

14        Q    How much approximate time per week on

15    average?

16        A    That varies from maybe five hours to 20

17    hours, just depends.

18        Q    What is SCORE?

19        A    Service Core of Retired Executives.

20        Q    You're one of the retired executives?

21        A    Well, not everybody's retired volunteers

22    for SCORE.  I'm a counselor with SCORE.

## Capital Reporting Company

Page 78

1    certification attached as well so it is different.

2        Q    It is approving your FMLA leave, correct?

3        A    Yes.

4        Q    Are you aware of any time that Express,

5    your former employer, denied any FMLA leave request

6    that you made?

7        A    What was the question?

8        Q    Are you aware of any time that your former

9    employer Express denied any FMLA requests that you

10   made?

11       A    They did not deny a request that I made.

12       Q    What is your FMLA claim against the

13   company?  What did that company do that violated the

14   FMLA?

15       MR. EHRENBERG:  Object to the form.  That asks

16   for a legal conclusion.  She's not a lawyer, so I

17   don't think that's an appropriate question.

18       Q    Your counsel in the complaint filed on

19   your behalf alléges that the company violated the

20   FMLA and you're a human resources background.  What

21   I'm asking you was there anything that happened to

22   you during your employment with Express that you

**Capital Reporting Company**

Page 79

1    believe resulted from your FMLA leave request?

2         A    I can't answer that.

3         Q    Why can't you answer that?

4         A    Because I don't have memorized or what the

5    details about the FMLA and all that it entails.  I

6    asked for leave because I was sick, that's the

7    aspect of FMLA.

8         Q    And you have a lawsuit against the

9    company.  I'm asking you just verify all your leave

10   requests under the FMLA were approved by Express,

11   correct?

12        A    I asked for two medical leaves with an

13   extension that were granted.  These are two leaves

14   with one being extended that was granted, that's all

15   I state.

16        Q    No leave requests were denied?

17        MR. EHRENBERG:  I'm going to object.  You've

18   asked and that's been answered.  To the extent

19   you're trying to get her to make a legal conclusion

20   or state a basis for the claim, she's already

21   answered your question so you have what you need for

22   summary judgment.

**Capital Reporting Company**

1          A      I don't remember.

2          Q      Did anybody say you were being discharged

3     because you were on an FMLA leave?

4          A      I don't recall that.

5          Q      Did anybody make any comments about your

6     FMLA leaves?

7          A      Yes.

8          Q      Who?

9          A      Kristin Bosley.

10         Q      What did she say?

11         A      She made offhanded comments under her

12    breath and to other people about she would mimic me

13    and make comments that indicated she questioned the

14    validity.

15         Q      Of your leave request or of your

16    accommodation request?

17         A      All of it.

18         Q      When were these comments made?  We're

19    looking at some documents that show -- why don't we

20    verify the timeframe.  Look at Exhibit 1, says that

21    your FMLA leave began on 12/8/03.  Is that your

22    understanding?  Do you have any reason to disagree

**Capital Reporting Company**

Page 82

1    that that was the beginning of your FMLA leave?

2        A    Without looking at my own personal notes

3    to be able to say dead certain, but I'm just nervous

4    about that because I don't have my calendar in front

5    of me.  I can assume this is right.

6        Q    You don't have any reason to disagree with

7    that date?

8        A    No.

9        Q    You returned to work at some point in late

10   December, correct?

11       A    Yes.

12       Q    You went back out on a leave if you look

13   at Exhibit 2 states that your leave began on

14   February 3, 2004?

15       A    Yes.

16       Q    You returned in late December and returned

17   to work February 2004?

18       A    That's what this looks like.

19       Q    I'm asking you, is your recollection any

20   different as we sit here today?

21       A    I have to depend on these papers because I

22   don't have a direct recollection.

## Capital Reporting Company

Page 84

1       A       December 23rd.

2       Q       December 23 was your return to work date?

3       A       Correct.

4       Q       So you were on leave approximately from,

5   and again we don't have your calendar, but just talk

6   about these exhibits from December 8, 2003 until

7   December 23, 2003?

8       A       Yes.

9       Q       You worked until February 3, 2004 when you

10  went on an FMLA leave again, correct?

11      A       Correct, Elise O'Niell also made comments.

12          (Pagonakis Exhibit No. 4 was marked)

13      Q       Handing you Defendant's Exhibit 4.  It

14  says effectively immediately March 18, 2004?

15      A ·     I couldn't return to work.      ·

16      Q       I'm not asking you why.  I'm asking is

17  that the date March 18th?

18      MR. EHRENBERG:  Object to the form.  If you let

19  her finish, you said she resigned and she was

20  answering your question, so please let her finish.

21      MR. CAMPBELL:  Jason, this is for me to ask

22  questions.

**Capital Reporting Company**

Page 88

1      MR. EHRENBERG:  We'll stipulate that's when the

2  second leave started because that's what the

3  documents show.

4      A    I said that already.

5      MR. EHRENBERG:  Right, so there's nothing left

6  to answer.

7      Q    And your leave was extended all the way

8  through the date of March 18, 2004 when you

9  resigned, correct?

10     MR. EHRENBERG:  Object to the form, you can

11  answer.

12     A    My leave ended and I was supposed to

13  return to work on the 18th and I could not return to

14  work.

15     Q    You remained on leave from February 3,

16  2004 until March 18, 2004 when you decided you

17  couldn't return to work and you submitted a letter

18  of resignation?

19     MR. EHRENBERG:  Object to the form again, you

20  can answer.  And I think the question has already

21  been answered.  She said that she was out on leave

22  from February 3rd through March 18, so you can try

Page 91

1          (Record was read)

2     Q     Are you saying they didn't take place

3  while you were on leave?

4     A     No, nobody called me while I was on leave.

5     Q     So you returned to work, what was said to

6  you about your FMLA leave?

7     A     Offhand comments.  I don't know that I can

8  recall exactly at this time what people said, but

9  there were just snide comments made to me and to

10  other employees.

11     Q     You can't recall any of the snide

12  comments?

13     A     With accuracy probably not at this time.

14     Q     Who made these comments?

15     A·    Elise, Ana, Kristin Bosley.      ·

16     Q     Did you nonetheless ask for a second leave

17  and it was granted?

18     A     I didn't hear the first couple words.

19     Q ·   You nonetheless asked for a second FMLA

20  leave and it was granted?

21     A     Yes.

22     Q     You can't give us anything as to the

**Capital Reporting Company**

Page 93

1    to take a few minutes off the floor to eat my lunch

2    earlier to get it out of the way before the heavy

3    time came and so I ran in the back to grab a half a

4    sandwich I had packed because you pack at that time

5    of year, you don't go out to lunch, and I sat down

6    to eat it and Ana poked her head out the door and

7    saw me sitting there and said how do you need a

8    break, made a comment about me sitting down.

9        Q    Any other comments during this time

10    period?

11        A    She and Elise were in the office --

12    actually Elise before Ana made that comment Elise

13    came in the back and saw me siting there and went

14    into the office where Ana was and then they both

15    came out and Ana made the comment about that and

16    Elise said, yeah, I never get to sit down.

17        Q    Any other comments during this time period

18    when you returned to work?

19        A    That was a specific one I can remember.

20    Just general comments about how do you rate and I'm

21    characterizing the nature other than the one that

22    Ana said.

Page 94

1       Q     That's the only specific comment you can

2   recall?

3       A     At this time, yeah, that was a -- I was

4   shocked at that.

5       Q     Can't recall any other comments?

6       A     I can't recall specific ones, how do you

7   rate, that phrase came out often.

8       Q     Anything else?

9       A     I can't remember more specifics, just the

10  general.

11      Q     Now let's go on to your employment with

12  Express during the Summer of 2003.  At some point

13  you were promoted to a co-manager position, correct?

14      A     To the best of my memory that was the

15  time.

16      Q     How many co-managers were employed at the

17  Christiana Mall store?

18      A     I would have to look that up.  They had a

19  full staff.  I'd have to look it up.  I can't

20  recall.  I can't remember who all was working at

21  that time.

22      Q     What was in general the revenue of the

**Capital Reporting Company**

Page 97

1          A      I don't know that I'm going to be able to

2    remember that.   I can't recall at this time.

3          Q      How do you know she was a co-manager when

4    she was working part-time hours?

5          A      She attended all the co-manager meetings.

6    I was told she was a co-manager.   I interacted with

7    her as a co-manager.   I guess as far as court proof

8    I guess I can only assume by those things that she

9    was co-manager.

10         Q      You were paid full-time salary, correct?

11         A      Yes.

12         Q      You worked at Express for quite awhile,

13   right?

14         A      Yes.

15    .     Q      You were initially hired about 1999?

16         A      '89 or '99, yes.

17         Q      1998 or 1999?   You said '89?

18         A      I worked for them for approximately seven

19   years, whatever that backs out to.

20         Q      Did you understand that each store had so

21   many associate hours per week that it could use?

22         A      Yes.

## Capital Reporting Company

Page 98

1    Q    And so the associates were scheduled based

2  on those numbers of hours that the store was

3  allocated?

4    A    Yes.

5    Q    And if a co-manager is scheduled to be

6  paid for 40 hours they were considered at least 40

7  hours on the schedule, correct?

8    A    If what?

9    Q    The store had a certain number of hours

10  that it could employ associates for each week,

11  right?

12    A    I think I need to say something here in

13  relation to these questions, if you're asking about

14  my hours.

15    ·Q    I'm asking you about the store in general

16  right now?

17    A    When Ana gave me my assignments my payroll

18  came out of the Christiana store.  She gave

19  Christiana extra hours to compensate for my hours

20  out of the store.

21    Q    I'm asking you about the general store

22  right now, general policies of Express.  Do you

Page 104

1    traffic.

2        Q    What were daylight hours where you could

3    work and then get home before it got dark?

4        A    That changes every day as the sun changes.

5        Q    I'm talking about the holiday season.

6    Right now about this time of year when you're

7    heading into the holiday, November, December?

8        A    I'm not going to be able to tell you that

9    without looking at a calendar and see when the sun

10   sets and when it rises, whether it's a cloudy day, a

11   sleeting day, a foggy day.  I can't pinpoint

12   specific hours.  It's approximately I would try to

13   leave work a half an hour before I looked every

14   single day when the sun rose and when the sun set

15·  and looked at the weather conditions and timed

16   myself to have a half an hour to get to and from

17   work.

18       Q    Your work hours would change on a daily or

19 · weekly basis?

20       A    Pretty much daily because you get less

21   time until the 20th and more time after the 20th.

22   Once you hit the solstice your daylight hours are

**Capital Reporting Company**

Page 105

1    longer again.

2        Q    If it was foggy, sleeting or snowing hard

3    you wouldn't be able to drive?

4        A    I wouldn't be able to drive until the fog

5    usually cleared.  I would not be too late and that

6    was bad weather and I couldn't drive and it looked

7    like that might happen being longer than a short

8    period then I had resources available on those

9    occasions to help me.

10       Q    Do what?

11       A    Get to work.

12       Q    So in general what you were asking for is

13   if you woke up in the morning and it was foggy you

14   would call in and say I'll come in once the fog

15   lifts?

16       A    That's what I was provided.

17       Q    Or if you woke up and it was snowing hard

18   you would wait to see if the snow would stop or try

19   and get alternative means to get in to work?

20       A    Yeah.

21       Q    Would that be the same if it was raining?

22       A    It depended on how bad it was raining, how

**Capital Reporting Company**

Page 106

1   dark the clouds were.  If it's some rain it didn't

2   affect me.  If it was where most of the cars on the

3   road are pulling off the road then I didn't venture

4   out until that heavy part of the storm stopped.

5       Q    When you started your shift it had to be

6   flexible for you just in case something came up; is

7   that right?

8       A    Yes.

9       Q    Then at the end of the shift did you just

10  simply look out and make a decision when you were

11  leaving or how did that work?

12      A    I looked at when the sun was setting,

13  every day you have various people coming in at

14  various different times and most of the staff was

15  very cooperative.  If it was raining they'd say my

16  gosh, it's raining or cloudy or it's dark, but

17  typically I would know when the sun was going to set

18  so I'd have a target time to leave and aim at that

19  target time which, like I say, changed a minute or

20  two every day and I had it to a science.

21      Q    And November December presumably you had

22  to leave earlier at the end of the day than you

## Capital Reporting Company

Page 108

1      Q     You would agree that the holiday season

2    for a consistent period over a three or four week

3    time period November December is the busiest time?

4      A     Not busiest, some years there's times it

5    can be busy.

6      Q     What other four week period is busier than

7    the November December time period?

8      A     I don't know.  I'd have to look at

9    records.

10     Q     You worked there for nine years?

11     A     I worked there for seven years.  I think I

12   remember some occasions where a return time is

13   busier actually than pre-Christmas.  So I can't say

14   that, yes, the three weeks leading to Christmas are

15   the busiest time.  I don't have statistics.  How  ·

16   about I don't know is my answer.  I don't know.

17     Q     Thank you.  On the accommodations up until

18   November 2003 you admit that Express always

19   accommodated your restrictions?

20     MR. EHRENBERG:  Object to the form, you can

21   answer.

22     A     Up until when?

Page 109

1          Q      November of 2003, say November 1, 2003?

2          A      Yeah.

3          Q      Were there any comments made -- are you

4     alleging any comments or problems up until November

5     1, 2003?

6          A      Yes.

7          Q      What are you alleging?

8          A      From the time that Ana started to promote

9     me and discuss higher options and opportunities for

10    me with the company Kristin and Elise challenged

11    that decision with Ana, made it known to me that

12    they challenged it, made comments under their

13    breath, made comments to other managers, made

14    comments to employees and continually made comments

15    to me.  I was degraded, belittled, humiliated in

16    front of other people, in front of customers.

17         Q      When did these comments begin?

18         A      I don't know that I'm going to be able to

19    give you a date.

20         Q      Shortly after transferring to Delaware,

21    was it in 2003?

22         A      I think I answered that.  When Ana started

# Capital Reporting Company

Page 131

1      A    Because I was completely having a

2   breakdown.  It was killing me.  I was completely

3   exhausted, emotionally drained, physically drained.

4   Completely unable to stay awake.  I couldn't do

5   daily functions at home.  I put every ounce of

6   energy I had into the job and it was sucking the

7   life out of me.

8      Q    How many nights did you work from November

9   25th, 2003 until December 8, 2003?

10     A    First of all I already said I don't know

11  and that's not relevant to this statement I just

12  made.

13     Q    Well, it is relevant because November

14  25th, 2003 is when you said that Tara told you they

15  couldn't accommodate·you, you went on leave on

16  December 8, 2003 and you said that the shift sucked

17  the life out of you.  I'm asking how many shifts

18  sucked the life out of you?

19     A    I didn't get days off.  I didn't get

20  breaks.  I didn't get time to go to the bathroom.  I

21  didn't get lunch breaks.  Very frequently I would go

22  10 days of working without a day off.  It doesn't

**Capital Reporting Company**

Page 132

1   have to do with --

2        Q    November 25th, 2003 to December 8th, 2003,

3   I don't even think there's probably 10 days total in

4   that time period?

5        A    You must have a stronger fortitude of

6   physical strength than I do.

7        Q    You said you worked 10 days straight?

8        A    I answered you.  I'm sorry if that's

9   amazing to you.  It's a fact.

10       MR. EHRENBERG:  Your question assumes that they

11  were accommodating her on the 25th.  You didn't ask

12  her if they were not accommodating her before that

13  so I think she answered your question.

14       Q    When is it your testimony that they

15  stopped accommodating you?

16       A    I'm not going to be able to give you that

17  date without referring to my calendar.  It's years

18  since then.  I don't have that on the tip of my

19  ahead.

20       Q    It's your testimony they just stopped

21  accommodating you and it was before Tara came in to

22  meet with you?

## Capital Reporting Company

Page 150

1    Q    Were you there to hear it?

2    A    I was told by other managers that this was

3    said to them.

4    Q    What comments did you hear specifically

5    from anybody directly to you?

6    A    Comments like, oh, is the weather nice for

7    you, don't quote this, this is the gist of the

8    comments, it would be nice if I could not have to do

9    this or that.  It was ironic that Elise continually

10   made comments about my schedule when she her self

11   worked Monday through Friday for the most part till

12   5:00 o'clock.

13   Q    What other comments do you recall?

14   A    My authority with the staff was

15   continually challenged, people would get·yelled at

16   for speaking to me, they would get assigned bad,

17   distasteful jobs.  If I was speaking with an

18   employee giving them a directive because I was

19   responsible for the sales floor it would be

20   challenged.  Elise would come out to the floor and

21   see me and come over and challenge, she continually

22   challenged me as to what I was doing and why I was

### Capital Reporting Company

Page 151

1   doing it.  She would walk up to customers that I was

2   helping and say I see no one's helping you.  That's

3   one thing I recall her specifically saying.

4   Comments made as I walked past.  She doesn't do

5   anything, she just walks around here doing nothing.

6   If I had to go get some something in the room and

7   back out on the sales floor I would walk past her,

8   she would make a comment is that all you do is walk

9   around, all these assumptions, harassing comments.

10      Q    What else?

11      A    All day long on and on and on.

12      Q    What else?

13      A    Many comments to every little thing.  One

14   time Elise and Kristin were doing something together

15   over in an area and they called me over there and

16   one of them said, oh, can I see your ring and she

17   took my hand and said, oh, my God, that looks like

18   an antique and the other one one was like putting

19   her hands all over my face and rubbing my cheeks and

20   they were touching me and I asked them to stop.

21   They were like mocking me and making fun of me.  One

22   time Kristin slapped me in the face with her gloves.

**Capital Reporting Company**

Page 153

1    to them.

2         Q    Any other comments?

3         A    Several other comments I can't recall

4    right now.

5         Q    We were talking about your accommodations

6    from December 23, 2003 when you went on your second

7    FMLA leave, you said they made you at times climb

8    too high, climb ladders?

9         A    They didn't make me climb because I

10   refused to do it.  I was given an assignment to

11   completely take down all of the men's denim on the

12   back wall which was, I don't know, 15, 20 feet high,

13   refold it and put it back up.

14        Q    And you just simply told them you couldn't

15   do it and didn't do it?

16        A    I got other people to help me do it and it

17   didn't get completely done because -- I don't know.

18        Q    How else did they not accommodate you

19   during that period?

20        A    They didn't give me breaks on a regular

21   basis.  If I needed to go to the bathroom, must be a

22   thing with the company because if you ask to go to

**Capital Reporting Company**

Page 154

1    the bathroom and you wait a reasonable amount of

2    time to make an adjustment to let me go I was denied

3    going to the bathroom.

4         Q    You weren't allowed to go to the bathroom?

5         A    Wasn't allowed to go to the bathroom.

6         Q    What other accommodations were you denied?

7         A    Some lunches, wasn't even allowed to stop

8    for lunch, or it would be so late in the day that I

9    have a head injury, you're supposed to eat at

10   regular intervals or it's not healthy for your head,

11   normal people get lunch breaks.

12        Q    What other ways were you not accommodated

13   during this time period?

14        A    Climbing, I told you they asked me to do

15   higher levels of work and I was told to go out and

16   do them on the sales floor in the middle of the

17   store.  Those were part of the accommodations

18   originally granted.  I don't know.  I've gone

19   through this.  The scheduling, sometimes my day off

20   would be Sunday, Monday and then I would work the

21   whole rest of that week, the weekend all the way up

22   until Friday, Saturday.  So I worked like, what is

**Capital Reporting Company**

Page 155

1    that, 10 days without a day off.  Everybody else,

2    all the other managers, had a particular day of the

3    week that they were scheduled off so they could

4    count on Wednesday is my day off, I can make my

5    appointments.  I never got my schedule till the last

6    minute.

7         Q    Anything else during this timeframe, is

8    that everything?

9         A    I don't know that that's everything.

10   That's what I can recall right now.

11        Q    So you worked until February and then you

12   went on a leave of absence again?

13        A    Yes.

14        Q    Do you recall Jennifer Hinckle's name as

15   being a individual in human resources that you were

16   communicating with at least via e-mail?

17        A    Yes.

18        Q    Did ever go back to Jennifer and say, hey,

19   some of my restrictions aren't being accommodated?

20        A    I can't remember that.

21        Q    So do you know if you went to anybody in

22   the human resources department to say, hey, the

### Capital Reporting Company

Page 164

1    day?

2        A    Well, knowing myself and my habits I would

3    say that this second March 24th I sent because this

4    first one possibly was turned in by hand and I'm

5    following up.

6        Q    Why does it say I'm sending a hard copy as

7    a follow up to the resignation letter faxed?

8        A    I must have faxed it.  This is obviously

9    another method to make sure they received it.

10        Q    So based on that I'm assuming that you

11    never talked to anybody about your resignation, you

12    didn't talk to Ana, Kristin or Susan?

13        A    It says I had no response in any form of

14    communication from either you, Kristin, since the

15    start of my medical leave.  So, no, nobody discussed

16    anything.

17        Q    You faxed that resignation letter on March

18    18th and didn't talk to anybody about the reasons

19    for your resignation?

20        MR. EHRENBERG:  Object to the form.

21        A    Yeah, I had spoken about -- for months I

22    had been talking about my problems and getting no

## Capital Reporting Company

Page 181

1    released you to return to work on March 18th, 2004?

2        MR. EHRENBERG:  Object to the form.  Is there a

3    question?

4        Q    Did it release you to return to work on

5    March 18th, 2004?

6        A    That's what it looks like.

7        Q    And your doctor didn't fill in any

8    accommodations that were necessary?

9        A    None evident on this copy.

10       Q    And you resigned, we went through,

11   effective March 18th, 2004?

12       MR. EHRENBERG:  Object to the form, you can

13   answer.

14       A    I did not return to work on that day.

15          (Pagonakis Exhibit No. 13 was marked)

16       Q    Show you what's been marked as Exhibit 13.

17   Have you ever seen this work force planning document

18   before?

19       A    I couldn't say whether I have or not.

20       Q    Do you see the management and sales

21   section?

22       A    Yes.

**Capital Reporting Company**

Page 183

1    seven years, right?

2        A    Approximately, yes.

3        Q    You held a management position for

4    approximately six to eight months?

5        A    Two years, year and a half.  I can't

6    remember when I had the promotion, whenever that

7    was.

8        Q    I would assume that you were generally

9    familiar with the written policies of Express?

10       A    That's a difficult question to answer.  I

11   had some knowledge of some of the policies.

12       Q    Did you understand that -- I'm asking you

13   about the written policies, not about practices.

14   Did you understand that Express says written

15   policies prohibited discrimination?

16       A    Yes.

17       Q    Did you understand that Express's written

18   policies provided for FMLA leaves?

19       A    That they have written policies?

20       Q    That provided for FMLA leaves?

21       A    Yes.

22       Q    Did you understand that there was an open

## Capital Reporting Company

Page 184

1    door policy, meaning if you had issues you can

2    contact the human resource department supervisors or

3    others?

4        A    Yes.

5        Q    And did you understand that the company's

6    written policies provided for the accommodation of

7    disabilities?

8        A    Yes.

9        MR. CAMPBELL:  Take a short break.

10                    (Off the record)

11   BY MR. CAMPBELL:

12       Q    I want to make certain that there's

13   nothing else you recollect that's relevant to your

14   claims against Express as we sit here today that you

15   haven't already testified about?

16       MR. EHRENBERG:  Object to the form, you can

17   answer.

18       A    Not that I can think of right now.

19       Q    Your counsel gave a list of witnesses in

20   the initial disclosures, if you want talk to your

21   counsel you can.  I can go through the whole list,

22   it looks to be a lot of information from counsel if

**HRDIRECT**
THE ONE RESOURCE FOR YOUR BENEFITS INFORMATION

 ORIGINAL

December 10, 2003

Paula Pagonakis
140 Back Creek Dr.
Middletown, DE  19709

Dear Paula:

You have been granted leave in accordance with the Family and Medical Leave Act (FMLA) for your own medical condition.

Your leave under FMLA began on 12/8/03.  Please be aware of the following expectations and obligations:

- The leave will be counted against your Family and Medical Leave Act (FMLA) entitlement of 12 weeks;

- The Company reserves the right to require you to furnish medical certification of your own or your family member's health condition.  You have already provided such certification;

- In the case of a leave for your own serious health condition, you will be required to present a fitness for duty certificate to be returned to employment;

- The Company may require substitution of paid leave under certain circumstances if you have remaining vacation time, sick time, or disability time.

- You will be required to give periodic updates on your status and your intent to return to work;

- Ordinarily, you will have a right to be returned to the same or an equivalent job upon your return from leave;

If you do not plan to return to work as of the end of your approved leave, please contact your Manager/Supervisor and HR Direct at 1-866-473-4728.  If you fail to report to work at the end of your approved leave, the Company will assume you wish to voluntarily resign.

If you have any questions concerning your rights and obligations under FMLA, please contact HR Direct.

Sincerely,

Susan Manos
Case Management Consultant



DEFENDANT'S
EXHIBIT
1
PAGONAKIS

PENGAD 800-631-6989

THE LIMITED, INC./INTIMATE BRANDS, INC.
Four Limited Parkway East
Reynoldsburg, Ohio 43068
1.866.HRDIRECT (1.866.473.4728)
Fax 614.577.6396

*No because a medical leave does not go with other form after 12/18 you must...* (handwritten)

# REQUEST FOR LEAVE

Please complete this request if you are requesting to take a leave of absence. Return the completed form to HR Direct. The address and fax are provided below.

1. I, _Paula Pagonakis_, request to take family leave for the following reason:
   Associate Name(please print)

   _____ To care for my child after birth.

   _____ To care for my newly adopted child.

   _____ To care for my foster child.

   _____ To care for my spouse, son, daughter, or parent who has a serious health condition. (Attending physician must complete a Certification of Health Care Provider Form. Call to request a copy of this form.)

   __X__ For a serious health condition that causes me to be unable to perform the essential functions of my job.

   _____ Personal, state reason: _____.

2. I am requesting my leave to begin on (date) _12-7-05_ and end on _12-23-05_

3. I am requesting to use ____0____ PTO days during my leave.
   Please note if your leave is being paid under the disability program, five PTO days will be used in the beginning of your leave. PTO days requested on this form will be in addition to those used at the beginning of your leave. PTO will not be paid during any time that an associate is receiving short- or long-term disability payments.

   Please check the following if it applies to you:

4. _____ I am requesting a Family Leave for intermittent periods. I have attached information concerning the time I need to take off from work.

I understand that if I am on maternity related disability leave and do not return this form, I am expected to return to work six (6) weeks following the normal delivery of my child, or eight (8) weeks after delivering my child by cesarean section.

I understand that it is my responsibility to keep my Manager updated on my condition and my intent to return to work. I have attached a written certification from a health care provider.

_Paula J. Pagonakis_                          _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_
Associate's Signature                          Social Security Number

_____          _____
Manager's Signature                            Date

_____          _____
HR Manager's Signature                         Date
Home Office/Distribution Center/Client Contact Center Associates Only

Return to:      **HR DIRECT**
                **FOUR LIMITED PARKWAY**
                **REYNOLDSBURG, OHIO 43068**
                **Fax: (614) 577-6396**

Request for Leave
Revised 11/02

P001439

# The Limited, Inc.
## MEDICAL DISABILITY and/or WORKER'S COMPENSATION CLAIM STATEMENT

**Directions:**
- This form is to be used for any medical absence over 5 days.
- Associate must complete Part I of this form and have their attending physician complete Part III.
- The completed form should be returned to:  **HR Direct**
  **Attn: Case Management**
  **Four Limited Parkway**
  **Reynoldsburg, OH 43068**
  **FAX: (614) 577-6396**

The standards, level of scrutiny and conditions for approval of Short Term Disability Benefits may differ from Long Term Disability benefits. This means the approval of any Short Term Disability does not mean or imply that an application for Long Term Disability for the same or related injury or illness will also be approved. See your Associate Guide for program details.

### PART I – To be Completed by ASSOCIATE
### (Please Print)

Name: PAULA PAGONAKIS

Address: 140 BACK CREEK DR.
MIDDLETOWN, DE 19709

What Business Do You Work For? EXPRESS

Work Location (State): DE

Social Security #: 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

Date of Birth: 12-18-1952

Phone (302) 376-9858

Work Location: Store ☒ Home Office ☐ DC/CC ☐

Last Day Worked: 12/4/03

Marital Status: ☐ Single ☒ Married  Number of Tax Exemptions _____

Is Condition Work-Related: ☐ Yes ☒ No  Nature of Illness/Injury: FATIGUE, DEPRESSION

Was Accident Involved? If Yes, When and Description: _____

I hereby swear that the above are true and I agree to reimburse MetLife to the extent of any overpayment which is in excess of the amounts payable under the Group Health Benefits Plan with MetLife.

To all providers of medical or dental services or suppliers and their representatives, all insurers, utilization programs, medical or hospital service plans, prepaid health plans, employers, group policyholders or contract holders; I authorize any Physician, Insurance Company, Service Plan or Association to disclose to any authorized representative of MetLife Disability Plan, The Limited, Inc or any one of their designated representatives any information regarding my medical history, treatment, disability or benefits payable.

Associate's Signature: Paula J. Pagonakis    Date: 12/13/03

### PART II – To be Completed by HRDirect CASE MANAGER CONSULTANT
### (Please Print)

Associate's Name: _____  Social Security #: _____

Hire Date: _____ Group Health Plan Effective Date: _____ Date of Disability: _____

Date Returned to Work: _____ Job Title: _____  Weekly Earnings: _____

Salary Continuation Period: from _____ to _____

**For New York Associates Only** - Avg  Weekly Wage for 8 Calendar Weeks Immediately Preceding Week Disability Commenced:
_____

Division _____  Group/Contract #: **1510100**  Employer ID # (EIN): _____

Case Manager Consultant

Signature _____  Phone # _____  Date Sent : _____

P001440

TO: H.R. DIRECT

Attn SUSAN

FROM

PAULA PAGONAKIS

STORE 340

PENGAD 800-631-6989

DEFENDANT'S
EXHIBIT

3

PAGONAKIS

## TOTAL CARE PHYSICIANS, P.A.

[ ] Philadelphia Pike Office [ ] Omega Office [ ] Glasgow Office

### RETURN TO WORK MEDICAL CERTIFICATION

Patient Name: Paula Pagonakis _____ has been under my care from

12.8.03 to 12.22.03 and is able to return to work on

12.23.03 _____. I certify that this patient is able to resume performing

the function of his/her position with or without reasonable accommodation. Necessary

accommodation(s) is/are as follow(s): needs previous accommodations _____

Badillo R.                                    12.8.03
Health Care Provider                          Date    TOTAL CARE PHYSICIANS, PA
                                                      2600 GLASGOW AVE.
                                                      SUITE 124
                                                      NEWARK, DE 19702

I am allowing my health care provider to release to my employer the reason for my absence from

work _____

Patient's Signature                           Diagnosis

/Total Care Physicians, P.A.
Family Medicine Office
Glasgow Medical Center
Suite 124
2600 Glasgow Avenue
Newark, DE 19702

302-836-4200 (voice)
302-836-8431 (fax)

*Exp*
*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*

TO: Susan

FAX NUMBER: 614-577-6396

FROM: Lee

DATE: 12/10

RE:

TOTAL NUMBER OF PAGES BEING SENT, including cover page:

---

### TOTAL CARE PHYSICIANS, P.A.

[ ] Philadelphia Pike Office [ ] Omega Office [✓] Glasgow Office

## RETURN TO WORK MEDICAL CERTIFICATION

Patient Name: Paula Pagonakis _____ has been under my care from
12/8/03 to 12/22/03 and is able to return to work on
12/23/03 . I certify that this patient is able to resume performing
the function of his/her position with or without reasonable accommodation. Necessary
accommodation(s) is/are as follow(s): ~~No lifting~~ Flex time hours; no living
at nite; no climbing

Dr. Bradley, L.C. _____ 12/10/03
Health Care Provider                            Date

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

I am allowing my health care provider to release to my employer the reason for my absence from
work. _____

Patient's Signature                          Depression / O.Led Epicondentis
                                             Diagnosis

EXPRESS-PAG000014

December 23, 2003

To Whom It May Concern:

Paula Pagonakis is under my care. Due to her traumatic brain injury in 1995 she needs the following accomodations with her job:
1. Daylight work hours
2. Well lit work area
3. No climbing
4. No wet work place
5. Periodic break as provided by law
6. Intermitten days off every 3-4 days

Please call our office if you have any additional questions.

Sincerely,

Dr. _____, M.D.

Rb/et



Professional Bldg. - Suite 101, 1320 Philadelphia Pike, Wilmington, DE 19809
Omega Professional Center, Bldg. B-Suite 89, Omega Drive, Newark, DE 19713
Glasgow Medical Center, Suite 124, 2600 Glasgow Avenue, Newark, DE 19702

302-788-0666
302-738-5500
302-836-4200

EXPRESS-PAG000010

March 18, 2004


Ana Klancic

CC:    Susan – HR Direct
       Kristyn Bosley



Dear Ana,

    Please accept my resignation effective immediately.



                        Yours truly,

                        Paula J. Pagonakis



## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC AMENDED | 170-2004-01038 |

and EEOC

| State or local Agency, if any | | |
|---|---|---|

| Name (Indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Ms. Paula Pagonakis | (302) 376-9858 | 12-18-1952 |

| Street Address | City, State and ZIP Code |
|---|---|
| 140 Back Creek Drive, Middletown, DE 19709 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| LIMITED BRANDS, INC. (EXPRESS)  STORE #340 | 201 - 500 | 302-738-9221 |

| Street Address | City, State and ZIP Code |
|---|---|
| SPACE 506, CHRISTIANA MALL, 440 CHRISTIANA MALL ROAD, NEWARK, DE 19702 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☒ AGE  ☒ DISABILITY  ☐ OTHER (Specify below.)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| 12-01-2001 | 11-25-2003 |

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I. I have been employed by Limited Brands, Inc. (The "Respondent") since 1998. I am a qualified individual with a disability as defined by the American with Disabilities Act of 1990 (the "ADA"). Since my hire in 1997, I have been provided with reasonable accommodations by the Respondent. The reasonable accommodations included being permitted to work at home; to work a flexible schedule; and to work only daytime hours. On November 25, 2003 I was informed by Tara Kessler, Human Resources Generalist that the Respondent would no longer provide me with a reasonable accommodation because the person who initially provided this accommodation did not have the authority to do so. I was directed to contact Respondent's Human Resources Director and provide him/her with appropriate medical documentation. When I attempted to hand the required documents to Ms. Kessler, she refused to accept them. A women from H.R. Direct, Emily (last name unknown) told me that the handling of reasonable accommodations was Ms. Kessler's responsibility. I am continuing to work but with significant difficulty due to being denied the previously provided reasonable accommodation.

II. I believe that I am being discriminated against (denied reasonable accommodations) because of my disability in violation of the ADA.

JAN 2004
Received
EEOC - Philadelphia
District Office

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 9/28/05   DATE   *Paula J Pagonakis*   SIGNATURE | |
| 1/30/04   Date   *Paula J Pagonakis*   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

DEFENDANT'S EXHIBIT
6
PAGONAKIS

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 170-2004-01038 |

_____ State or local Agency, if any _____ and EEOC

**THE PARTICULARS ARE** *(Continued from previous page):*

**III.** Since shortly after Kristyn Bosley (age: 30) became Manager in about the Fall 2001, I am not always asked to participate in management discussions and I am never included in management decision making. All of other Co-Managers are often asked by Ms. Bosley to provide input. They are also significantly younger than I.

**IV.** I believe that I am being excluded from participation in certain management activities and decision because of my age, 51, in violation of the Age Discrimination in Employment Act of 1967 based.

ADDENDUM:

V.   I further allege that I was forced to resign from my position with the Respondent due to the ongoing discrimination and Respondent's continued failure to accommodate me.

A
JAN 2004
Received
EEOC - Philadelphia
District Office

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 9/28/05<br>DATE        *[signature]*<br>1/30/04<br>Date        *[signature]* Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

March 24, 2004

Ana Klancic
Express – Springfield Mall
Space 7,8,9
1250 Baltimore Pike
Springfield, PA 13064

CC:  Kristyn Bosley
     Susan – HR Direct

Dear Ana,

I am sending a hard copy as a follow-up to the resignation letter Faxed to you last Thursday so I can feel more assured you have received it.

I have had no response to any form of communication from either you or Kristyn since the start of my medical leave, February 3, 2004. I have communicated to you through e-mail, phone messages, voicemail and FAX during this time period with no response from you or Kristyn.

Sincerely,

Paula J. Pagonakis

Enc:  copy of Faxed letter of resignation March 18, 2004.



TOTAL CARE PHYSICIANS, P.A.

[ ] Philadelphia Pike Office [ ] Omega Office [√] Glasgow Office

## RETURN TO WORK MEDICAL CERTIFICATION

Patient Name: _Paula Pagonakis_____ has been under my care from

___3/15/04___ to ___3/17/04___ and is able to return to work on

___3/18/04___. I certify that this patient is able to resume performing

the function of his/her position with or without reasonable accommodation. Necessary

accommodation(s) is/are as follow(s): _____

___Dr. Badillo/ e_____        ___3/11/04___
   Health Care Provider                    Date

I am allowing my health care provider to release to my employer the reason for my absence from

work. _____        _____

   Patient's Signature                           Diagnosis





DEFENDANT'S
EXHIBIT
PENGAD 800-631-6989
12
PAGONAKIS