# EXHIBIT E

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE

                          - - -

      PAULA PAGONAKIS          :
                               :
             vs.               :   NO. 06-027
                               :
      EXPRESS, LLC, a/k/a      :
      LIMITED BRANDS, INC.     :

                          - - -
```



```
             Saturday, April 28, 2007
             Philadelphia, Pennsylvania

                          - - -


        Oral deposition of ANA KLANCIC,

   taken pursuant to notice, at the Law Offices

   of Sidney L. Gold & Associates, PC, 1835

   Market Street, Suite 515, Philadelphia,

   Pennsylvania, on the above date, beginning at

   approximately 9:20 a.m., before Ruth L. Mott,

   RPR, CRR and Notary Public.

                          - - -
```

```
             MEDIA COURT REPORTING
             216 West Front Street
                Media, PA  19063
      610.566.0805  fax 610.566.0318
         www.mediacourtreporting.com
         mcr@mediacourtreporting.com
```

1                    Ana Klancic

2    how did a store get an allocation of hours?

3    Do you understand what I mean?  Did the

4    stores have a certain amount of hours that

5    they could pay associates each week?

6         A.    Yes.

7         Q.    And how was that determined?  How

8    did a store -- Cherry Hill -- how would

9    Cherry Hill be told how many hours they had

10   that week?

11        A.    It was based on a matrix and that

12   matrix was based on your volume.

13        Q.    And could the hours -- was it given

14   to you in a week or was it a different

15   period?  Do you understand what I'm saying,

16   how they say you have blank number of hours

17   per week or was it a different timeframe?

18        A.    Weekly.

19        Q.    Did the hours allocation change

20   each week or in general did it remain the

21   same?

22        A.    Changed every week.

23        Q.    Were store managers expecting to

24   keep the total hours worked within that

25   budget?

f6d6b6a4-0499-4243-9547-070c667f75de

Ana Klancic

1

2      A.    Yes.

3      Q.    And the budget would include --

4  would encompass the salaried hours as well,

5  correct?  Do you understand what I'm saying?

6  If a store was given -- let's just throw out

7  a number -- say a thousand hours -- if a

8  store was given a thousand hours in a week --

9  and I know that number's just arbitrary,

10 pulled out -- would those thousand hours --

11 it's not just associate hours, it would also

12 include the store manager and co-manager

13 hours, correct?

14     A.    Yes.

15     Q.    So the store managers and

16 co-managers -- in general was it expected

17 that they work at least those 40 hours and

18 potentially more per week in order to

19 maintain the budget?

20     A.    Yes.

21     Q.    Just so I understand, a store

22 manager, they were automatically budgeted for

23 40 hours each week, right?

24     A.    Correct.

25     Q.    So if a store manager only worked

f6d6b6a4-0499-4243-9547-070c667f75de

Ana Klancic

1
2  25 hours in a week, that store essentially
3  lost 15 hours on the budget, right?
4      A.   The store manager position?
5      Q.   Yes.  If a store manager, in week
6  one of the year where Cherry Hill's budgeted
7  1,000 hours, arbitrary number, thousand
8  hours, store manager only work 25 hours that
9  week, in effect the store manager left 15
10 hours on the table; they've lost 15 hours on
11 the budget, right?
12     A.   That's correct.
13     Q.   So the store manager -- in general,
14 I would assume the store manager and
15 co-managers, when you were in those
16 positions, were expected to work 40 and even
17 more hours per week, right?
18     A.   Correct.
19     Q.   Okay.  Opening and closing -- was
20 there certain employees at the store who were
21 required to be at the store when the store
22 opened and closed?  Do you know what I mean?
23     A.   No.
24     Q.   Was a store manager, a co-manager,
25 was there any level of employee that was

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

1                      Ana Klancic

2    required to be at the store when it opened?

3         A.    Yes.

4         Q.    What level?

5         A.    A store manager or assistant

6    manager.

7         Q.    Or co-manager?

8         A.    Co-manager.

9         Q.    Co and assistant, in case we used

10   it interchangeably, are the same for purposes

11   of this deposition; do you agree?

12        A.    Yes.

13        Q.    Are they referred to as key

14   holders?

15        A.    Yes.

16        Q.    Okay.  And so one of those, either

17   a store manager or a co-manager, would have

18   to be at the store when it opened?

19        A.    Correct.

20        Q.    How about when it closed?

21        A.    The same; store manager or an

22   assistant or co-manager.

23        Q.    Okay.  And in general -- I realize

24   each mall is different, but in general were

25   there set hours that the stores would remain

f6d6b6a4-0499-4243-9547-070c667f75de

Page 28

Ana Klancic

1  open?

2  A.    Yes.

3  Q.    What were those?

4  A.    Open at 10:00 a.m.

5  Q.    Is that to the public open?

6  A.    Yes.

7  Q.    Okay.

8  A.    And close at 9:30 p.m.

9  Q.    Okay.

10  A.    Again, pending the center.

11  Q.    The mall.   Okay.   And if a store
opened to the public at 10:00 a.m., did the
store officially open for the employees prior
to that?

12  A.    Yes.

13  Q.    Okay.   How many hours or minutes
did it open typically prior to it opening to
the public?

14  A.    Depending on the location, two
hours.

15  Q.    Okay.   And if a store were to close
to the public at 9:30 p.m., what time did
typically the store manager or co-manager
close that store?

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

1                          Ana Klancic

2         A.    11:00 p.m.

3         Q.    There's some duties that have to be

4    performed both before and after -- both

5    before opening and after closing by the

6    management?

7         A.    Correct.

8         Q.    Okay.  And so when scheduling --

9    who in general is responsible at a store for

10   scheduling the hours?  Is there a certain

11   position within the store who schedules?

12        A.    Well, it's either the store manager

13   or the co-manager that's in charge of the

14   human resources division responsibility.

15        Q.    Okay.  Now, in your stores when you

16   were district manager in the stores within

17   your district was the schedule for the week

18   published in advance of that work week?

19        A.    Yes.

20        Q.    And did the associates and managers

21   have -- if they had a conflict, they couldn't

22   work one evening because of a family

23   obligation or some other obligation outside

24   of work did they have the opportunity to talk

25   to that scheduler to try to modify the

Ana Klancic

2  schedule?

3       A.    Yes.

4       Q.    And so if, for example, say I'm a

5  store manager, my co-manager is scheduling

6  and the co-manager schedules me for five

7  straight days and then two days off -- just

8  throw it out as a seven-day week, and I

9  wanted to, if possible, have -- work three

10 days, take a day off, work three more days,

11 would that be something that I could raise

12 with the scheduler prior to the beginning of

13 the work week?  I would see the schedule and

14 could raise that with the scheduler?

15      A.    Yes.

16      Q.    Finally, as the opening and

17 closing, if you are the key holder

18 responsible for opening and closing -- I'm

19 assuming it's imperative that that key holder

20 arrive to the store on time when opening the

21 store because you've got other associates who

22 are there waiting for the store to be opened?

23      A.    Correct.

24      Q.    Okay.  I just want to go through

25 some of the policies.  I'm assuming you're

f6d6b6a4-0499-4243-9547-070c667f75de

Page 46

Ana Klancic

1    A.    Yes.

2    Q.    And same as prohibiting harassment

3 during your employment?

4    A.    Yes.

5    Q.    And the written policies also

6 require the accommodation, the reasonable

7 accommodation of disabilities as well; do you

8 agree with that?

9              MR. BAILEY:  Object to the

10       form.

11              THE WITNESS:  Yes.

12 BY MR. CAMPBELL:

13    Q.    Okay.  And just finally on the open

14 door policy, if you as district manager -- an

15 open door complaint could come to the

16 district manager, correct?

17    A.    Yes.

18    Q.    And you as a district manager

19 received a complaint that involved the

20 allegation of discrimination or harassment,

21 would you partner with human resources in

22 those situations?

23              MR. BAILEY:  Object to the

24       form.

Page 47

Ana Klancic

1    THE WITNESS:  Yes.

2    BY MR. CAMPBELL:

3        Q.    So if human resources wasn't aware

4    of a complaint from an employee of

5    discrimination or harassment -- strike that.

6            Any complaints that you received of

7    discrimination or harassment, is it safe to

8    say that you would have notified human

9    resources of those complaints?

10            MR. BAILEY:  Object to the

11        form.

12            THE WITNESS:  Human resources

13        and my regional manager.

14    BY MR. CAMPBELL:

15        Q.    You would have notified human

16    resources and your regional manager of any

17    complaint that you received of discrimination

18    or harassment during your employment?

19            MR. BAILEY:  Object to the

20        form.

21            THE WITNESS:  Yes.

22    BY MR. CAMPBELL:

23        Q.    If you'd just let me finish my

24    question just so the record is clear -- any

MEDIA Court Reporting - 610.566.0805

1    Ana Klancic
2  complaints that you received during your
3  employment with Express of discrimination or
4  harassment you would have notified your
5  regional manager and the human resources
6  department with those complaints, correct?
7            MR. BAILEY:  Object to the
8      form.
9            THE WITNESS:  I can't say that
10     it was always both.
11 BY MR. CAMPBELL:
12     Q.    Okay.  One or the other?
13     A.    One or the other.
14     Q.    Okay.  If an investigation was
15 required during your employment of a
16 complaint of harassment or discrimination,
17 would you partner with human resources?
18     A.    Yes.
19     Q.    And that was always the case?
20     A.    Yes.
21     Q.    Let's move on to Ms. Pagonakis and
22 her claims.  I want to show you a couple
23 documents so we can put a timeframe as to
24 this matter.
25            (Documents marked Deposition

f6d6b6a4-0499-4243-9547-070c667f75de

Page 50

Ana Klancic

1    years.

2    Q.    I'm talking about when you were a

3    district manager that five-year period; was

4    the Christiana Mall store at all times within

5    your district?

6    A.    Yes.

7    Q.    Okay.  Now, you don't recall seeing

8    the letters, these two letters that I've

9    shown you, Exhibits 3 and 4, correct, as you

10   sit here today?

11   A.    Correct.

12   Q.    Do you believe that you received

13   these letters or no?

14   A.    I'm not sure.

15   Q.    Okay.  Let me just ask you, first

16   of all, is it your understanding that Ms.

17   Pagonakis voluntarily resigned from her

18   employment with Express?

19   A.    Yes.

20   Q.    Okay.  Now, let's focus on Exhibit

21   4, first of all, the longer letter, where Ms.

22   Pagonakis is referring to a medical leave

23   that started on February 3, 2004.  Do you see

24   that in the second paragraph?

25

Page 54

Ana Klancic

her over that period?

A.    Those dates to me, I don't know.
Like I can't remember what those dates are.
I mean, I obviously talked to Paula
Pagonakis.  She was one of my assistant
managers, co-manager, but I don't remember
dates.

Q.    Okay.  And I guess the key point of
my question is, Ms. Pagonakis says that she
didn't talk to you essentially -- she didn't
talk to you from February 3, 2004 until her
resignation.  Do you have any reason to
disagree with that?

A.    I really don't recall.

Q.    Okay.  So you don't recall any
conversations that took place during that
period?

A.    No, I don't.

Q.    Okay.  Now, Ms. Pagonakis
transferred from an Ohio store to Delaware.
When did you first come into contact with Ms.
Pagonakis from your recollection?

A.    When I got promoted to the district
manager she was already a sales associate in

f6d6b6a4-0499-4243-9547-070c667f75de

Page 57

Ana Klancic

Pagonakis testified that if she woke up in

the morning and there was fog in the area

that she would call the store and say, I

can't come in until the fog has lifted.

A.    That's correct.

Q.    Or in the winter months -- if in

the winter months it got dark earlier, her

schedule would be modified due to when the

sun was going down; did you understand that?

A.    Yes, that's correct.

Q.    So in the summer months she might

be able to work a longer schedule into the

evening versus in the winter months?

A.    Correct.

Q.    Okay.  At the time of this

promotion into the brand sales lead position,

who was the store manager at the Christiana

Mall store?

A.    Kristyn Bosley.

Q.    And was Ms. Bosley the store

manager all the way through March 2004?

A.    Yes.

Q.    Okay.  And so the first time that

you became aware of any accommodations being

f6d6b6a4-0499-4243-9547-070c667f75de

1              Ana Klancic

2    discussions directly with Ms. Pagonakis as to

3    what her physical or mental condition was

4    that caused her to need to work this shift?

5         A.    Yes.

6         Q.    When did that conversation take

7    place?

8         A.    I don't recall.

9         Q.    Well, she resigned in March 2004.

10   Would it have been close in time to the

11   resignation or would it have been when we're

12   talking about these -- closer in time to

13   promotions to brand sales lead?

14        A.    It was closer to her resignation.

15        Q.    What do you recall from that

16   conversation?

17        A.    I was -- at the time we were

18   eliminating a lot of special schedulings with

19   the company, and human resources -- I'm not

20   sure who that person was at the time.  I

21   think also with Scott Miller; he was our

22   regional vice president.  We were eliminating

23   a lot of the special positions in scheduling,

24   and then Paula Pagonakis came up of why she

25   worked a special schedule.  You know, I

f6d6b6a4-0499-4243-9547-070c667f75de

Page 60

Ana Klancic

1
2   informed him of what her disability was, and
3   they told me that I needed to get
4   documentation from her because we didn't have
5   anything on it.
6       Q.   Okay.  Let me just take one step
7   back.  It's my understanding from the charges
8   of discrimination and testimony that November
9   2003 is approximately the time when Ms.
10  Pagonakis was asked to provide medical
11  documentation.  Does that help your
12  recollection as to when this conversation
13  took place when the scheduling issues were
14  addressed?
15      A.   I'm not sure.
16      Q.   Okay.  You don't have any reason to
17  disagree with that timeframe, though, the
18  November-December 2003 timeframe?
19      A.   I don't remember at all those
20  dates.
21      Q.   If those were the dates -- what I'm
22  asking you is, if that's what the record
23  shows in this case, you don't have any
24  specific recollection to say that it's a
25  different date?

Page 61

Ana Klancic

2    A.    That's correct.

3    Q.    Okay.  Now, prior to this

4  conversation -- we'll get into that

5  conversation and what you did after that

6  conversation.

7              MR. BAILEY:  Object to the

8      form.  This conversation --

9              MR. CAMPBELL:  Okay.  I'll be

10     a little more specific.

11  BY MR. CAMPBELL:

12     Q.    Prior to the discussions about

13  Express's decision to eliminate special

14  schedules, prior to that date was Ms.

15  Pagonakis always accommodated to your

16  knowledge?

17     A.    Yes.

18     Q.    And did you make the decision with

19  Ms. Bosley to promote Ms. Pagonakis to the

20  brand sales lead position?

21     A.    Along with our regional manager.

22     Q.    Okay.  Was that a part-time or

23  full-time position?

24     A.    Full-time.

25     Q.    And did Ms. Pagonakis work

f6d6b6a4-0499-4243-9547-070c667f75de

Ana Klancic

1
2  full-time hours, if you recall?

3      A.    She did some work for me from home,
4  but it did come to 40 hours total by the end
5  of the week.

6      Q.    So in the store she would work less
7  than 40 hours?

8      A.    In some occasions.

9      Q.    Okay.  And if she worked less than
10  40 hours in the store, she would pick up
11  hours at home?

12      A.    Yes.

13      Q.    Did you have any other employees in
14  your district at any time that were permitted
15  to work at home --

16      A.    No.

17      Q.    -- when you were district manager,
18  just so I'm clear?

19      A.    No.

20      Q.    Okay.  Why did you permit Ms.
21  Pagonakis to work from home?

22      A.    Because she wasn't able to drive in
23  the fog or rainy days, and the regional
24  manager was aware of this.

25      Q.    Aware of Ms. Pagonakis being

f6d6b6a4-0499-4243-9547-070c667f75de

Page 63

Ana Klancic

1  permitted to work at home?

3      A.    On those special days.

4      Q.    Okay.  When you say special days,

5  these days weren't scheduled in advance, the

6  days came up if Ms. Pagonakis said she

7  couldn't drive to the store for some reason?

8      A.    Correct.

9      Q.    Be it fog, snow or some other

10  weather condition?

11      A.    Correct.

12      Q.    So on those days, what did Ms.

13  Pagonakis do at home?  She called into the

14  store and said, hey, it's raining today, I

15  don't think I'm going to be able to make it

16  in?  What was she supposed to do?

17      A.    Well, because it was one of my

18  highest volume stores I spent at least one to

19  two days a week there, so I would always have

20  special things for her to do.  She was in

21  charge of my district newsletter for the

22  district, so she would do that on a weekly

23  basis, or she did some reference checks for

24  the store for the sales associates.

25      Q.    Okay.  So you'd have some special

1                    Ana Klancic

2    time of this work-at-home schedule, you know

3    what I mean, that if she worked at home

4    for --

5         A.    I think so.

6         Q.    Okay.  Did you notify each of the

7    regional managers or just one or some?

8         A.    I don't recall.

9         Q.    Did you ever notify human resources

10   of this work-at-home schedule?

11        A.    No.

12        Q.    Why not?

13        A.    It was never a question or concern

14   from my supervisor.

15        Q.    Your supervisor meaning who?

16        A.    Whoever was in charge at the time,

17   if it was my regional manager or Scott Miller

18   or the RVP.

19        Q.    But they may not have been aware of

20   her working at home, right?

21        A.    I don't know.

22        Q.    Okay.  So the bottom line is you,

23   in your view, didn't need to get approval

24   from human resources for this work at home?

25        A.    Correct.

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Page 66

Ana Klancic

1

2    Q.    Now, when you're advised by the

3    Regional VP Scott Miller and human resources

4    that the special schedules needed to be

5    eliminated, did that include working at home?

6    A.    Yes.

7    Q.    Okay.  Was that made specific to

8    you that you cannot work -- associates and

9    managers are not permitted to work outside of

10   the store?

11   A.    Correct.

12   Q.    Okay.  So at that point in time --

13   and that was applicable to all associates and

14   managers at that time when they come to you,

15   it's not just Paula Pagonakis, it's every

16   employee in your district?

17   A.    Correct.

18   Q.    And every employee in your district

19   was prohibited from having from that point

20   forward some sort of a special schedule, so

21   to say, outside of the typical scheduling

22   process?

23   A.    Correct.

24   Q.    Do you know why?  Did Scott Miller,

25   your Regional VP, or human resource

                    Ana Klancic

1
2   department tell you why that Express policy

3   was being put in place or did they just tell

4   you the policy?

5       A.   Yes, they told us why, because it

6   was -- the hours were getting obviously

7   tighter at that time of year and we needed

8   the sales associate/managers to all be

9   present in the store.

10      Q.   That time of year being the holiday

11  season?

12      A.   Yes.

13      Q.   So you learn of the prohibition

14  against work-at-home schedules and the

15  special schedules, and I think you testified

16  that you went to Ms. Pagonakis after that

17  meeting?

18      A.   Yes.

19      Q.   Okay.  And was anybody with you

20  when you spoke with Ms. Pagonakis at that

21  time?

22      A.   I don't recall.

23      Q.   Okay.

24      A.   If there was, it would have been

25  Kristyn Bosley, the store manager.

1                        Ana Klancic

2        Q.    Okay.  What do you recall from the

3    conversation with Ms. Pagonakis at that time?

4        A.    The only thing that I recall is

5    letting her know that human resources needed

6    a doctor's note, you know, obviously

7    explaining her needs.

8        Q.    Okay.  And did you tell her who she

9    should contact?

10       A.    Who she should contact?

11       Q.    Yes.  Did you give her a location

12   or person that she should provide those

13   doctors' notes to?

14       A.    Yes.

15       Q.    Okay.  Who was that, if you recall?

16       A.    I don't recall.

17       Q.    Could it have been HR Direct or you

18   just --

19       A.    It was definitely human resources.

20       Q.    Did you ask her at that time what

21   was her disability?

22       A.    Yes.

23       Q.    What did she tell you, if you

24   recall?

25       A.    Because of this accident that she

Page 69

Ana Klancic

1  had she was not able to drive in the dark;

2  she was not able to drive in the rain or fog.

3      Q.   Did she tell you that -- well,

4  first of all, how long ago was the accident?

5  Was it close in time?  Was it many years

6  before; do you not know?

7      A.   It was many years before.

8      Q.   Did she say, you know, that I get

9  headaches?  What was her condition?  Did she

10  have a diagnosis that she told you?

11      A.   I think she lost like direction,

12  like she wouldn't know -- she would get lost

13  and not know where she was.

14      Q.   Okay.  When I say diagnosis, like,

15  for example, I tell you that I have high

16  blood pressure or I have diabetes.  Did she

17  put a name to what her condition was?

18      A.   I don't recall.

19      Q.   Do you recall if Ms. Pagonakis

20  provided the medical documents to human

21  resources as you requested?

22      A.   No, she did not.

23      Q.   Why not?

24      A.   She actually provided me with some

1          Ana Klancic

2          MR. CAMPBELL:  Okay.  Then we

3     can go through each one.

4    BY MR. CAMPBELL:

5          Q.    Let's start at paragraph 2 on page

6    1 of the declaration and let's go through

7    this.  The last sentence you state in your

8    capacity as district manager you had fairly

9    frequent contact with and supervision of

10   Paula Pagonakis.  The frequent contact, how

11   so?

12         A.    Weekly.

13         Q.    Because you were in that store at

14   times?

15         A.    Correct, and phone conversations.

16         Q.    Okay.  Now, paragraph 3 states that

17   I was aware that Paula -- and you're

18   referring to Ms. Pagonakis as Paula, correct?

19         A.    Correct.

20         Q.    Suffered from medical

21   conditions/disabilities that necessitated

22   certain accommodations in the workplace.

23         I'm going to ask you, first of all,

24   we've gone through extensively as to your

25   conversations with Ms. Pagonakis.  What

f6d6b6a4-0499-4243-9547-070c667f75de

Page 90

1                    Ana Klancic

2     medical condition/disability did Ms.

3     Pagonakis suffer from?

4          A.    Not being able to drive at night or

5     in the fog or in the rain.

6          Q.    Okay.  But you don't know what

7     medical condition necessitated those

8     symptoms, so to say?

9          A.    No, I'm not a doctor.

10         Q.    Okay.  Well, it says you were aware

11    of it, that she suffered, but you don't know

12    what specific disability or medical condition

13    that she had?

14         A.    No.

15         Q.    Okay.  And the accommodations in

16    the workplace, what was your understanding of

17    the accommodations that Ms. Pagonakis

18    believes she required?

19         A.    I'm sorry; can you repeat that?

20         Q.    Well, you say that you were aware

21    that Paula suffered from a medical condition

22    and disability or slash disability and that

23    that condition necessitated certain

24    accommodations in the workplace.

25               Do you see that first sentence?

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Page 94

Ana Klancic

go get something to eat, just sit down for a
few minutes.

Q.    Were her breaks any different than
the breaks provided to any other associate at
the store?

A.    Yes.

Q.    How so?

A.    She needed more frequent breaks
than anybody else.

Q.    Okay.  Then B it says, only
scheduling Paula only for daylight hours.  Do
you see that?

A.    Yes.

Q.    And that's what we talked about?

A.    Yes.

Q.    And it wasn't only scheduling for
daylight hours, she also had a flexible
schedule in that some mornings she may not be
able to come in at all?

A.    Correct.

Q.    And it was unexpected, unless she
could predict the weather; if it was foggy on
Tuesday she couldn't come in until the fog
was lifted?

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Page 95

Ana Klancic

1

2    A.   Correct.

3    Q.   So was it your understanding that

4 Paula -- during her tenure under your

5 supervision while you're district manager

6 that Paula Pagonakis never opened the store

7 on a regular basis?

8    A.   I don't remember.

9    Q.   Okay.  How about closing the store

10 during the night hours?  Is your recollection

11 that she regularly closed the store?

12    A.   She did do it a few times.

13    Q.   But not on a regular basis?

14    A.   No.

15    Q.   C is not assigning Paula tasks that

16 called for climbing.  Do you recall that

17 accommodation?

18    A.   Yes.

19    Q.   Okay.  When do you recall learning

20 of that need for accommodation?

21    A.   From the beginning.

22    Q.   Okay.  And scheduling Paula for a

23 day off every three or four days, when did

24 you learn of that?

25    A.   From the beginning.

f6d6b6a4-0499-4243-9547-070c667f75de

Page 96

Ana Klancic

1
2       Q.    Meaning what, from the beginning of
3  what, her employment?
4       A.    Our conversation and from her
5  employment from the conversations that I had
6  with Kristyn Bosley.
7       Q.    Okay.  And then finally E,
8  periodically allowing Paula to work from
9  home.  That didn't begin until she was
10 promoted to a brand sales lead position,
11 correct?
12      A.    Correct.
13      Q.    And then you finally conclude that
14 Paula's direct supervisors at the Christiana
15 Mall store were also aware of her medical
16 conditions and her need for workplace
17 accommodations.
18           You weren't aware of what medical
19 condition she actually suffered from, right?
20      A.    Yes.
21      Q.    What medical condition did she
22 suffer from?  We've talked about the symptoms
23 but you don't know what condition she
24 suffered from, right?
25      A.    No.

1              Ana Klancic

2       Q.    Do you know whether the supervisors

3  knew what condition she suffered from?

4       A.    I don't know.

5       Q.    Okay.  Let me ask you, did you ever

6  receive any complaints from either Ms. Bosley

7  or other managers in the store about, hey,

8  why am I always opening or closing and Ms.

9  Pagonakis doesn't have to do it as a

10  co-manager?

11      A.    Yes, I did receive them.

12      Q.    Okay.  Because other co-managers

13  had to work additional openings and closing

14  because Ms. Pagonakis wasn't doing it, right?

15      A.    Correct.

16      Q.    And so their schedules would

17  necessitate them always coming in early or

18  potentially working later hours than a

19  typical schedule had the additional

20  co-manager also opened and closed?

21      A.    That's correct.

22      Q.    Did you inform human resources of

23  these complaints?

24      A.    No.

25      Q.    What did you do about the

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

1                        Ana Klancic

2            Is that the date that you recall

3    promoting her into that position?

4            A.    Yes.

5            Q.    You say, I felt that Paula was an

6    asset to our team, and then you finalize that

7    paragraph with, I agreed to keep Paula's

8    workplace accommodations in place at this

9    time because I wanted to encourage Paula to

10   remain part of our team.

11            Do you see that?

12           A.    Yes.

13           Q.    No other co-managers in your

14   district were given similar work schedules as

15   to what Ms. Pagonakis had, correct?

16           A.    Correct.

17           Q.    Were other co-managers given a set

18   time to arrive at the store each morning?

19           A.    Yes.

20           Q.    Okay.  And the other co-managers,

21   would they be disciplined if they showed up

22   15 minutes late to work on a regular basis?

23           A.    If it was, you know, frequent.

24           Q.    Okay.  But Ms. Pagonakis, if she

25   was going to show up late she could call in

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Ana Klancic

1
2    and say, it's foggy where I'm living, I'm
3    going to be late?
4        A.    Correct.
5        Q.    Or she could call in and say, it's
6    going to be rainy, I can't drive in?
7        A.    Correct.
8        Q.    And she was never disciplined for
9    that?
10       A.    No.
11       Q.    Now, paragraph 5, in the fall of
12   2003 my direct supervisors and
13   representatives of defendants human resources
14   department inquired as to why Paula was
15   receiving workplace accommodations, including
16   allowing Paula to work less than a 40-hour
17   work week.
18            Do you see that sentence in
19   paragraph 5?
20       A.    Yes.
21       Q.    First of all, does this refresh
22   your recollection as to when the special
23   schedule prohibition went into place?
24       A.    Yes.
25       Q.    Okay.  That's what you're referring

Page 101

Ana Klancic

2  to in this sentence, correct?

3      A.   Correct.

4      Q.   Okay.  And was it true that after

5  Ms. Pagonakis was promoted to co-manager in

6  June 2003 that she was permitted to work less

7  than a 40-hour work week as a co-manager?

8      A.   Yes.

9      Q.   And why was that?

10     A.   Because of her restrictions to

11 working in the weather.

12     Q.   Okay.  And so other co-managers or

13 the store manager would have to work

14 additional hours in order to make up for

15 those lost hours?

16     A.   Not always.

17     Q.   At times?

18     A.   At times.

19     Q.   And they certainly would have to

20 open when Ms. Pagonakis couldn't open?

21     A.   That's correct.

22     Q.   And they'd have to close when Ms.

23 Pagonakis couldn't close?

24     A.   But there was always more than one

25 manager working so there wasn't any

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Page 102

Ana Klancic

1  additional people that needed to come in.

3  Q.   Did any other co-manager during
4  your tenure as district manager have the
5  ability to not on a regular basis open or
6  close the store?

7  A.   I'm sorry; can you repeat that?

8  Q.   Was any other co-manager during
9  your tenure as district manager at Express
10 given the accommodation of not having to open
11 or close on a regular basis?

12 A.   I don't remember.

13 Q.   Okay.  It's a pretty regular and
14 frequent duty of a co-manager to open and/or
15 close a store, correct?

16 A.   Correct.

17 Q.   And when you let Ms. Pagonakis work
18 less than a 40-hour work week she was
19 nevertheless being paid a salary of 40 hours
20 a week as a co-manager, correct?

21 A.   Correct.

22 Q.   Now, the last sentence in paragraph
23 5 says, I was instructed by my superiors at
24 this time -- and I'm assuming that is fall
25 2003, the at this time?

MEDIA Court Reporting - 610.566.0805

f6d6b6a4-0499-4243-9547-070c667f75de

Page 103

1                              Ana Klancic

2        A.    Yes.

3        Q.    Okay.   To cease all accommodations

4    until Paula provided medical documentation of

5    her need for the accommodations.   Do you see

6    that?

7        A.    Yes.

8        Q.    And it's your recollection that

9    Paula was never able to provide those medical

10   documentation?

11       A.    Not that I can recollect.

12       Q.    Okay.   And from this date forward

13   because she couldn't provide the medical

14   documents she had to work a typical

15   co-manager schedule?

16       A.    Correct.

17       Q.    And paragraph 6, the last line of

18   page 2, it says, the termination of Paula's

19   employment; you agree that she voluntarily

20   resigned.   We went through those letters,

21   correct?

22       A.    Yes.

23       Q.    So her employment wasn't terminated

24   by Express?

25       A.    No.

f6d6b6a4-0499-4243-9547-070c667f75de

Ana Klancic

1
2    is that correct?

3        A.    Oh, I don't know about that.

4        Q.    Okay.  Do you have knowledge of how

5    a discrimination complaint would proceed at

6    the store?  I don't want to get anything too

7    much into your -- do people file a charge of

8    discrimination with the store manager?  Do

9    they have to go to HR Direct?  I'm not asking

10   actually specifically, just general knowledge

11   of how that works.

12       A.    It should go to human resources.

13       Q.    Now, are you aware of any

14   complaints that were written complaints of

15   discrimination at that store that Paula

16   worked at?

17       A.    No.

18       Q.    Okay.  Now, the defense went

19   through your declaration that you executed

20   on, what is that, the 9th day of March?

21   Exhibit 7.  Is everything you stated in this

22   declaration true?

23            MR. CAMPBELL:  I'm going to

24       object.  She's gone through in detail

25       each sentence of the declaration.

Page 134

Ana Klancic

2  Ms. Pagonakis after December 23, 2003?

3       A.    Yes.

4       Q.    Okay.  So if she would have shown

5  this to you and you reviewed it and it was

6  your ultimate choice, although you don't

7  specifically recall it, you would have

8  accommodated these restrictions, right?

9       A.    Yes.

10              MR. CAMPBELL:  Okay.  I don't

11  have any further questions at this time.

12              MR. BAILEY:  I don't have

13  anything.

14              MR. CAMPBELL:  We can close

15  the record for today.  I think your

16  counsel can talk to you about reading.

17              MS. WEXLER:  We'll read and

18  sign.

19              MR. CAMPBELL:  With that we

20  can close the record for today.  Again,

21  thank you very much for coming out on a

22  Saturday.

23              (Witness excused.)

24              (Deposition concluded at 12:05 p.m.)

25              - - -

f6d6b6a4-0499-4243-9547-070c667f75de

## Hinkle, Jennifer

**From:** Hinkle, Jennifer
**Sent:** Monday, December 29, 2003 1:31 PM
**To:** EXP Region 20011 - Klancic, Ana
**Subject:** RE: (no subject)

Yes and no, we do make every attempt to make an accommodation for an associate. We do however, always have the ability to say the restrictions are too severe and we cannot work with them. In these situations we would work with the lawyers to ensure we were OK with our position. In Paula's situation we may not have a choice because she has been working only day hours for years and years. It would be hard for us now to say that we couldn't accommodate her in this area. Does that make sense?

Have you received a copy of the restrictions? If so, what are your thoughts? If you want to discuss live today, call me at 614-226-6694.

Thanks Ana.

-----Original Message-----
**From:** EXP Region 20011 - Klancic, Ana
**Sent:** Monday, December 29, 2003 1:12 PM
**To:** Hinkle, Jennifer
**Subject:** RE: (no subject)

Hi Jennifer, thank you for getting this matter taken care of. But I do have a question? Do I really have a choice, but to accommodate her disability?

-----Original Message-----
**From:** Hinkle, Jennifer  o
**Sent:** Monday, December 29, 2003 1:08 PM
**To:** PPag4@aol.com
**Cc:** EXP Region 20011 - Klancic, Ana
**Subject:** RE: (no subject)

Hi Paula, Susan faxed me a copy of your restrictions. It is now up to Ana and your Store Manager to determine if they can make the accommodations outlined by your doctor.

Ana, if you have any questions, or need any assistance while Tara is on PTO, please let me know.

Thanks,
Jennifer Hinkle
HR Manager, Express

-----Original Message-----
**From:** PPag4@aol.com [mailto:PPag4@aol.com]
**Sent:** Friday, December 26, 2003 4:46 PM
**To:** Hinkle, Jennifer
**Subject:** Re: (no subject)

Ms. Hinkle,

I have to again thank you for your direct and clear communication. I will follow up with Susan as recommended.

Paula J. Pagonakis



12/30/2003

E X P R E S S - P A G 0 0 0 0 4 0