# EXHIBIT 1

## Capital Reporting Company

Page 1

1         IN THE UNITED STATES DISTRICT COURT FOR THE

2                    DISTRICT OF COLUMBIA

3    -----------------------------:
     PAULA PAGONAKIS,              :
4                                  :
           Plaintiff,             :
5                                  :
             v.                    :   Case No.:
6                                  :   06-027
     EXPRESS, LLC, a/k/a           :
7    LIMITED BRANDS, INC.,         :
                                   :
8          Defendant.              :
                                   :
9    -----------------------------:

10                                 Washington, D.C.
                                   November 20th, 2006
11

12   Deposition of:

13                    PAULA PAGONAKIS,

14         Called for oral examination by counsel for

15   Plaintiff, pursuant to notice, at the offices of Bailey

16   & Ehrenberg, PLLC, 1155 Connecticut Avenue, N.W., Suite

17   1100, Washington, D.C., beginning at 1:00 p.m, before

18   Teague Gibson of Capital Reporting, a Notary Public.

19

20              *    *  . *    *    *

21

22

## Capital Reporting Company

                                                      Page 10

    1        A    Correct.

    2        Q    You don't know a ballpark figure $10,000,

    3    a hundred thousand, 200,000?

    4        A    I can't remember.

    5        Q    Can't remember any aspect of the

    6    settlement?

    7        A    I know I had to pay medical bills

    8    afterwards for almost 10 years.

    9        Q    I'm asking you what did you get?

   10        A    I don't recall.

   11        Q    You'll have to?

   12        MR. EHRENBERG:  We can try to get that

   13    information.

   14        MR. CAMPBELL:  Give the name of her attorney

   15    and whatever documents are from that.

   16        MR. EHRENBERG:  I think we gave all those

   17    documents and the attorney's name is probably in

   18    there too but I'll go through them.

   19        Q    And do you have any continuing health

   20    problems as a result of that second car accident

   21    that occurred in 1995?

   22        A    Most definitely.

## Capital Reporting Company

Page 11

```
 1        Q      And what are those?

 2        A      I have a traumatic brain injury.  I have

 3    inner ear damage.  I have cognitive processing

 4    difficulty.  I have equilibrium problems.  I have

 5    functional vision problems.  I have fibromyalgia and

 6    I have persistent back and neck pain.

 7        Q      Anything else?

 8        A      That's what I can remember right now.

 9        Q      Have these been ongoing since 1995?

10        A      Yes.

11        Q      Continuous?

12        A      Yes, all permanent.  I also have

13    difficulty with short-term memory.

14        Q      Aside from the two auto accidents and this

15    lawsuit have you been involved in any other

16    litigation?

17        A      No.

18        Q      Do you remember filing any charges for

19    Workers' Compensation injuries for any employer?

20        A      I don't recall any.

21        Q      Don't recall filing any -- you understand

22    what Workers' Compensation is?
```

## Capital Reporting Company

Page 81

```
 1          A     I don't remember.

 2          Q     Did anybody say you were being discharged

 3    because you were on an FMLA leave?

 4          A     I don't recall that.

 5          Q     Did anybody make any comments about your

 6    FMLA leaves?

 7          A     Yes.

 8          Q     Who?

 9          A     Kristin Bosley.

10          Q     What did she say?

11          A     She made offhanded comments under her

12    breath and to other people about she would mimic me

13    and make comments that indicated she questioned the

14    validity.

15          Q     Of your leave request or of your

16    accommodation request?

17          A     All of it.

18          Q     When were these comments made?  We're

19    looking at some documents that show -- why don't we

20    verify the timeframe.  Look at Exhibit 1, says that

21    your FMLA leave began on 12/8/03.  Is that your

22    understanding?  Do you have any reason to disagree
```

## Capital Reporting Company

Page 84

    1        A    December 23rd.

    2        Q    December 23 was your return to work date?

    3        A    Correct.

    4        Q    So you were on leave approximately from,

    5    and again we con't have your calendar, but just talk

    6    about these exhibits from December 8, 2003 until

    7    December 23, 2003?

    8        A    Yes.

    9        Q    You worked until February 3, 2004 when you

   10    went on an FMIA leave again, correct?

   11        A    Correct, Elise O'Niell also made comments.

   12            (Pagorakis Exhibit No. 4 was marked)

   13        Q    Hancing you Defendant's Exhibit 4.  It

   14    says effectively immediately March 18, 2004?

   15    ·   A    I couldn't return to work.

   16        Q    I'm not asking you why.  I'm asking is

   17    that the date March 18th?

   18        MR. EHRENBERG:  Object to the form.  If you let

   19    her finish, you said she resigned and she was

   20    answering your question, so please let her finish.

   21        MR. CAMPEELL:  Jason, this is for me to ask

   22    questions.

Capital Reporting Company

Page 86

1    client's testimony.

2        MR. CAMPBELL:  Please don't raise your voice.

3        MR. EHRENBERG:  Dave, don't start telling me

4    how to act.  Ask your questions and let's go.  I'm

5    allowed to object and then I can instruct her to

6    answer so ask the question.  You didn't let me

7    finish my objection.

8        Q    This document, Exhibit 4, shows that you

9    resigned effectively March 18, 2004; is that

10   correct?

11       MR. EHRENBERG:  Object to the form, you can

12   answer.

13       A    I could not return to work.

14       Q    I'm not asking you why, I'm saying is the

15   date March 18th, 2004 when you resigned?   ·

16       A    March 18th I was supposed to go back to

17   work after my medical leave was over and I

18   physically, mentally, emotionally could not return

19   under the circumstances I could not return to work

20   physically, mentally, emotionally.

21       Q    If you want to talk to your counsel you

22   can, but when I ask a question I want an answer to

Page 91

1                    (Record was read)

2       Q     Are you saying they didn't take place

3   while you were on leave?

4       A     No, nobody called me while I was on leave.

5       Q     So you returned to work, what was said to

6   you about your FMLA leave?

7       A     Offhand comments.  I don't know that I can

8   recall exactly at this time what people said, but

9   there were just snide comments made to me and to

10  other employees.

11      Q     You can't recall any of the snide

12  comments?

13      A     With accuracy probably not at this time.

14      Q     Who made these comments?

15      A     Elise, Ana, Kristin Bosley.

16      Q     Did you nonetheless ask for a second leave

17  and it was granted?

18      A     I didn't hear the first couple words.

19      Q     You nonetheless asked for a second FMLA

20  leave and it was granted?

21      A     Yes.

22      Q     You can't give us anything as to the

## Capital Reporting Company

Page 99

1    understand what I'm asking you about?

2      A    I don't think I can answer that because I

3    never was trained in policies and procedures so.

4      Q    So you don't know anything about -- you

5    can't present any testimony in contradiction to what

6    Express's policies and procedures are as to

7    co-managers?

8      MR. EHRENBERG:   Object to the form, you can

9    answer.

10      A    I don't think you can make a blanket

11    statement. I did know some policies and procedures.

12      Q    Let s go through what you know. Did you

13    understand that the sore was allocated a certain

14    number of hours for work each week?

15    ·   A    Yes.             ·

16      Q    And how were those hours allocated?

17      A    I wasn't part of the allocation process.

18      Q    And a typical co-manager that was burning

19    40 hours how were those hours allocated to the

20    budget? If a co-manager was being paid for 40 hours

21    a week on a salary were they allocated 40 hours

22    towards the store hour allocation for the week?

Capital Reporting Company

Page 100

```
 1        A     I really don't know that.  There was

 2    something to do with extra hours and I don't think I

 3    can answer that.

 4        Q     You don't know?

 5        A     I don't think I know.

 6        Q     Did you understand that there always had

 7    to be a manager on duty when the store was open?

 8        A     Yes, not a key holding manager, not just a

 9    manager, a key holding manager.

10        Q     What did you understand that to be?

11        A     Someone who was trained as a manager and

12    passed a key holder's exam to prove a competency of

13    the responsibilities of a key holder.

14        Q     Were you a key holding manager?

15        A ·   I was not.                          .

16        Q     There had to be some key holding manager

17    at the Christiana Mall store always on the schedule;

18    is that correct?

19        A  ˙  That's what I understood the policy to be.

20        Q     And one of those key holding managers

21    always had to open and close the store; is that

22    correct?
```

## Capital Reporting Company

Page 109

1        Q    November of 2003, say November 1, 2003?

2        A    Yeah.

3        Q    Were there any comments made -- are you

4    alleging any comments or problems up until November

5    1, 2003?

6        A    Yes.

7        Q    What are you alleging?

8        A    From the time that Ana started to promote

9    me and discuss higher options and opportunities for

10    me with the company Kristin and Elise challenged

11    that decision with Ana, made it known to me that

12    they challenged it, made comments under their

13    breath, made comments to other managers, made

14    comments to employees and continually made comments

15    to me.  I was degraded, belittled, humiliated in·

16    front of other people, in front of customers.

17        Q    When did these comments begin?

18        A    I don't know that I'm going to be able to

19    give you a date.

20        Q    Shortly after transferring to Delaware,

21    was it in 2003?

22        A    I think I answered that.  When Ana started

## Capital Reporting Company

Page 126

1    by telling me that she had lost -- that my personnel

2    file had been lost.  She stated that since my

3    personnel file -- they did not have my personnel

4    file that I did not have -- she did not have

5    documents to validate my disabilities so she could

6    no longer accommodate me.

7        Q    Look at Exhibit 5.  Point you to on

8    November 5th, 2003, see that?

9        A    Yes

10       Q    Your charge which was close in your time

11   you were filing this charge on January 30th, 2004

12   you agree within two months of that meeting, right?

13       A    Yes.

14       Q    At that time you say "I was informed by

15   Tara Kessler, human resource generalist, that the

16   respondent, Limited Brands, Inc. Express, would no

17   longer provide me reasonable accommodation because

18   person who initially provided the accommodation did

19   not have the authority to do so."  You see that?

20       A    Yes.

21       Q    Is that true?

22       A    That was also what she told me.

## Capital Reporting Company

Page 129

1       A      No, I can't do that.

2              Q      At some point you switched over to a

3       full-time position?

4       A      Yes.

5              Q      Was Tara saying that as of this full-time

6       position they didn't have the authority to

7       accommodate you as to this?

8       A      She didn't specify.

9              Q      She asked you to provide medical

10      documents, right?

11      A      Correct.

12             Q      During this timeframe from November 25th,

13      2003 until you went on that leave, we've already

14      verified the dates that you went on a leave of

15      absence on December 8th, 2003, right?  ·

16      A      If that's the date we verified, yes.

17             Q      So from November 25th, 2003 until December

18      8, 2003 you only worked the daylight hours and they

19      continued to accommodate you during that period,

20      right?

21      A      No.

22             Q      What is it your testimony is?

## Capital Reporting Company

Page 130

1       A    There were some times that I was assigned

2    night.

3       Q    You had to work nights a couple times that

4    week?

5       A    I don't know what week.  There were some

6    times I had to work nights.

7       Q    The meeting was on November 25th, 2003

8    that you're saying Tara told you that they didn't

9    have authority to grant you the accommodations?

10      A    I know that Sunday was the first time that

11   I was required to work a night shift and it was

12   after hours shift after the store closed.

13      Q    Did Tara tell you that during the

14   accommodation process, during the review process,

15   that they would accommodate your restrictions?

16      A    No, she said she would not accommodate

17   anything, there was nothing she could do.

18      Q    So you went on an FMLA leave during the

19   accommodation review?

20      A    No, I kept working.

21      Q    Why did you go on the FMLA leave, Exhibit

22   1?

## Capital Reporting Company

1     A    Because I was completely having a

2   breakdown. It was killing me. I was completely

3   exhausted, emotionally drained, physically drained.

4   Completely unable to stay awake. I couldn't do

5   daily functions at home. I put every ounce of

6   energy I had into the job and it was sucking the

7   life out of me.

8     Q    How many nights did you work from November

9   25th, 2003 until December 8, 2003?

10     A    First of all I already said I don't know

11   and that's not relevant to this statement I just

12   made.

13     Q    Well, it is relevant because November

14   25th, 2003 is when you said that Tara told you they

15   couldn't accommodate you, you went on leave on

16   December 8, 2003 and you said that the shift sucked

17   the life out of you. I'm asking how many shifts

18   sucked the life out of you?

19     A    I didn't get days off. I didn't get

20   breaks. I didn't get time to go to the bathroom. I

21   didn't get lunch breaks. Very frequently I would go

22   10 days of working without a day off. It doesn't

## Capital Reporting Company

Page 150

1      Q     Were you there to hear it?

2      A     I was told by other managers that this was

3  said to them.

4      Q     What comments did you hear specifically

5  from anybody directly to you?

6      A     Comments like, oh, is the weather nice for

7  you, don't quote this, this is the gist of the

8  comments, it would be nice if I could not have to do

9  this or that.  It was ironic that Elise continually

10  made comments about my schedule when she her self

11  worked Monday through Friday for the most part till

12  5:00 o'clock.

13     Q     What other comments do you recall?

14     A     My authority with the staff was

15  continually challenged, people would get yelled at

16  for speaking to me, they would get assigned bad,

17  distasteful jobs.  If I was speaking with an

18  employee giving them a directive because I was

19  responsible for the sales floor it would be

20  challenged.  Elise would come out to the floor and

21  see me and come over and challenge, she continually

22  challenged me as to what I was doing and why I was

## Capital Reporting Company

Page 151

1    doing it.  She would walk up to customers that I was

2    helping and say I see no one's helping you.  That's

3    one thing I recall her specifically saying.

4    Comments made as I walked past.  She doesn't do

5    anything, she just walks around here doing nothing.

6    If I had to go get some something in the room and

7    back out on the sales floor I would walk past her,

8    she would make a comment is that all you do is walk

9    around, all these assumptions, harassing comments.

10        Q    What else?

11        A    All day long on and on and on.

12        Q    What else?

13        A    Many comments to every little thing.  One

14   time Elise and Kristin were doing something together

15   over in an area and they called me over there and

16   one of them said, oh, can I see your ring and she

17   took my hand and said, oh, my God, that looks like

18   an antique and the other one one was like putting

19   her hands all over my face and rubbing my cheeks and

20   they were touching me and I asked them to stop.

21   They were like mocking me and making fun of me.  One

22   time Kristin slapped me in the face with her gloves.

## Capital Reporting Company

Page 152

1   It goes on and on, any number of things, comments

2   all day long.

3           Q      You can't identify any other comments?

4           A      I could if we have to just sit here and

5   identify by comments.  Somebody would come in and

6   say hello and they'd get yelled at for talking to

7   me.  One time I came in to work, as I mentioned

8   managers quite often came in late, and I'm an on

9   time person, I along with other people would be

10  sitting on the bench outside the store waiting for

11  them to come and open the gates, and because we had

12  already been there and been on time maybe it was 20

13  after, that was 20 minutes that we weren't clocked

14  in.  The hourly people not getting paid for, myself

15  not getting credited towards my time and so when

16  that would happen you'd go to the closest computer

17  you could to clock in to get your time clocked in

18  and I would get singled out and told that that's not

19  a good example to set.  You should be totally

20  prepared for work before you clock in.  Nobody else

21  would have that.  Other people would be walking in

22  doing the exact same thing and no comment was made

## Capital Reporting Company

Page 153

1    to them.

2         Q    Any other comments?

3         A    Several other comments I can't recall

4    right now.

5         Q    We were talking about your accommodations

6    from December 23, 2003 when you went on your second

7    FMLA leave, you said they made you at times climb

8    too high, climb ladders?

9         A    They didn't make me climb because I

10   refused to do it.  I was given an assignment to

11   completely take down all of the men's denim on the

12   back wall which was, I don't know, 15, 20 feet high,

13   refold it and put it back up.

14        Q    And you just simply told them you couldn't

15   do it and didn't do it?                      .

16        A    I got other people to help me do it and it

17   didn't get completely done because -- I don't know.

18        Q    How else did they not accommodate you

19   during that period?

20        A    They didn't give me breaks on a regular

21   basis.  If I needed to go to the bathroom, must be a

22   thing with the company because if you ask to go to

Page 154

1    the bathroom and you wait a reasonable amount of

2    time to make an adjustment to let me go I was denied

3    going to the bathroom.

4        Q    You weren't allowed to go to the bathroom?

5        A    Wasn't allowed to go to the bathroom.

6        Q    What other accommodations were you denied?

7        A    Some lunches, wasn't even allowed to stop

8    for lunch, or it would be so late in the day that I

9    have a head injury, you're supposed to eat at

10   regular intervals or it's not healthy for your head,

11   normal people get lunch breaks.

12       Q    What other ways were you not accommodated

13   during this time period?

14       A    Climbing, I told you they asked me to do

15   higher levels of work and I was told to go out and

16   do them on the sales floor in the middle of the

17   store.   Those were part of the accommodations

18   originally granted.   I don't know.   I've gone

19   through this.   The scheduling, sometimes my day off

20   would be Sunday, Monday and then I would work the

21   whole rest of that week, the weekend all the way up

22   until Friday, Saturday.   So I worked like, what is

## Capital Reporting Company

Page 162

1    the hours you're working but at the same point

2    you're saying that you didn't know that your

3    accommodations were granted to you, I'm confused?

4        MR. EHRENBERG:  I object to the form.  I don't

5    think that was a question.  If you understand it you

6    can answer.

7        A    No, no one ever told me what was needed to

8    validate my disabilities beyond what I had

9    presented.  Even on top of that nobody would accept

10   what I was offering, they'd say go to this

11   department.  I'd call that department, they'd say no

12   this person -- there's documentation, there's all my

13   e-mail communication, you got it all.  There's

14   continuous ongoing --

15       Q    Anything in writing that you sent during

16   January, February, March 2004 you produced?

17       A    Yes, sir, plus all the verbal and phone

18   calls.  That's not all the communication there was,

19   that is the written communication there was.

20       Q    If you had all that why wouldn't you put

21   in your resignation letter something more than just

22   simply I'm resigning effective immediately?

## Capital Reporting Company

Page 163

1       A      Why? I don't know.  It's typical.

2    Everybody else that left there's a follow-up

3    interview, there's discussion.  When I was out on

4    leave nobody would even talk to me.  I called, I

5    followed my requirements to call periodically to

6    keep up-to-date with what's going on in the store.

7    I asked to speak with management, never returned my

8    phone calls.  They never once called to see how I

9    was, which is typical with everybody else that went

10   out sick.  No communication.  They did not

11   communicate with me no matter how hard I tried.

12          (Pagorakis Exhibit No. 8 was marked)

13       Q      Handing you Defendant's Exhibit 8.  Is

14   that your signature on that document?

15       A      Yes.

16       Q      You follow up six days later with a second

17   resignation follow-up letter, right?

18       A      Yes.

19       Q      In this time you have six days to think it

20   through and I guess it says faxed, I take it that

21   the letter I just showed you about the March 18th,

22   2004 letter resignation you actually faxed it that

## Capital Reporting Company

Page 166

```
 1        Q     Did you talk to Kristin?

 2        A     No.

 3        Q     The answer is you didn't talk to anybody

 4    about the resignation, right?

 5        MR. EHRENBERG:  Object to the form, you can

 6    answer.

 7        A     I'm not going to say that.  I tried for

 8    months to talk about my job situation.  You're

 9    making it sound like I just flipped off this letter

10    and refused to speak to anyone.  No, I'm sorry, I

11    did everything I could.  I exhausted myself

12    completely to the point of mental, psychological,

13    physical breakdown trying to talk to get this

14    resolved with, as you can see, no response, no

15    resolution, no response.

16        Q     Why didn't you attempt return to work and

17    continue to work as you did for the month before

18    your leave?

19        A    `Because it was killing me.  Because after

20    all these months I was facing going back to work and

21    receiving the same harassment, the same non-help

22    with my disability accommodations, the same run
```

## Capital Reporting Company

Page 167

1    around.  We don't know who to send the medical to.

2    We don't know what medical information is needed.  I

3    was facing -- I already tried twice for months.  How

4    many times would you keep going back and trying and

5    being beat to a pulp across the board to the point

6    where you weren't even a functional human being.

7    Would you stard in line and raise your hand and say,

8    yes, give it to me again.

9        Q    Have we testified to all the facts that

10   supported this claim that you were beaten to a pulp?

11       MR. EHRENBERG:  Object to the form.

12       A    I didn't hear you.

13       Q    Have you testified to everything today as

14   to the facts leading to this conclusion that you

15   were beaten to a pulp as a human being?                ·

16       A    I'm not answering that.

17       Q    Is there any other facts?

18       A    That was not a literal --

19       Q    You've used these?                ·

20       A    Nobody physically beat me.

21       MR. EHRENBERG:  You can ask him to rephrase the

22   question if you don't understand it.

## Capital Reporting Company

Page 205

```
 1    mentioned that they had recruited you; is that

 2    correct?

 3         A    Yes.

 4         Q    And can you tell me when you first

 5    expressed interest to someone at J. Crew about

 6    possibly working there?

 7         A    I would say within the first couple months

 8    after I no longer worked at Express.

 9         Q    So did you speak to anyone about being

10    interested in a position there before you left

11    Express?

12         A    No.

13         Q    Were you ever trained to be co-manager?

14         A    No, Kristin even said she asked Ana and

15    Ana told her she didn't have to train me.

16         Q    Were you ever -- is Kristin Kristin

17    Bosley?

18         A    Yes.

19         Q    And Ana is that Ana Klancic?

20         A    Yes.

21         Q    Were you ever trained to be a key holder?

22         A    No.
```