# EXHIBIT 6



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - -

PAULA PAGONAKIS          :
                         :
    vs.                  :   NO. 06-027
                         :
EXPRESS, LLC, a/k/a      :
LIMITED BRANDS, INC.     :

- - -

Saturday, April 28, 2007
Philadelphia, Pennsylvania

- - -

Oral deposition of ANA KLANCIC, taken pursuant to notice, at the Law Offices of Sidney L. Gold & Associates, PC, 1835 Market Street, Suite 515, Philadelphia, Pennsylvania, on the above date, beginning at approximately 9:20 a.m., before Ruth L. Mott, RPR, CRR and Notary Public.

- - -

MEDIA COURT REPORTING
216 West Front Street
Media, PA  19063
610.566.0805   fax 610.566.0318
www.mediacourtreporting.com
mcr@mediacourtreporting.com

05/23/2007 19:56 FAX 202 659 1027    BIRCH HORTON BITTNER    003/019
Case 1:06-cv-00027-SLR    Document 56-7    Filed 05/23/2007    Page 3 of 19

Page 15

Ana Klancic

[during] your last four or five years of [em]ployment with Express?

A. And Maryland.

Q. And Maryland. And I don't want to [go] into what your beliefs are, what your [a]ims are, I just want to know what were you [tol]d as to your reason for your discharge by Express, if anything? Were you told by Express, this is why we're discharging you?

A. Discrimination.

Q. What do you mean by that? Did they tell you?

A. Yes.

Q. Okay. What did they explain?

A. That I was being terminated for discriminating against African Americans.

Q. And who told you that? Who from Express is the one who informed you of your discharge?

A. Gina Cordero.

Q. Anyone else?

A. And Bridgette Jackson.

Q. And Gina was in human resources at the time?

Ana Klancic

If an associate at a store, one of the stores in your district, simply says -- let's say it's an associate and the associate doesn't raise any medical requirements, just simply says, I can't work evenings, how would that accommodation -- I realize that's not a medical accommodation, but how would that accommodation be reviewed by a store?

MR. BAILEY: Object to the form.

THE WITNESS: Usually a doctor's note needs to be provided.

BY MR. CAMPBELL:

Q. We'll get into the medical in a second, but I'm just talking about -- say I'm one of the associates at an Express store within your district when you were employed at Express and I come to the store manager and say, you know what, I'm starting school and I'm going to take evening classes, I'd really just like to work during the days; would that request -- would that scheduling request -- how would that be reviewed by the store manager?

05/23/2007 19:57 FAX 202 659 1027    BIRCH HORTON BITTNER    ⌀005/019
Case 1:06-cv-00027-SLR    Document 56-7    Filed 05/23/2007    Page 5 of 19

Page 39

1                    Ana Klancic
2     A.    Well, we would see if that was an
3  availability that we could utilize for
4  scheduling purposes to run the business.
5     Q.    Okay. And if it was something that
6  you could -- that schedule would work for the
7  store, you might approve that schedule
8  request?
9     A.    Yes.
10    Q.    If it didn't work then I'd have to
11 make a decision between school or work --
12    A.    Correct.
13    Q.    -- in effect?
14          Now, in the medical standpoint, say
15 I come up with the same request, I don't want
16 to work. Say I can't work evenings for
17 whatever medical condition I have; I say to
18 the store manager, I can't work evenings due
19 to a medical condition, what is a store
20 manager to do when I come forward with that
21 issue?
22    A.    Again, it depends on the
23 availability if the store needs that specific
24 schedule.
25    Q.    Okay. So ultimately it comes down

05/23/2007 19:57 FAX 202 659 1027    BIRCH HORTON BITTNER    ☒006/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 6 of 19

Page 41

Ana Klancic

Who would I submit those medical documents to based on your understanding?

A. If you're a store manager?

Q. No, I'm an associate. Say I'm an associate in a store. I come to a store manager in your district and I say, store manager, my doctor tells me I can't work evenings. What's the store manager supposed to do? Do they direct me to someone else, to human resources, HR Direct, to you? Do they do it themselves? What do they do?

  MR. BAILEY: Object to the form.

  THE WITNESS: They handle it themselves. It goes in their personnel file if they have a doctor's note.

BY MR. CAMPBELL

Q. So your understanding is just simply it all comes down to whether you can accommodate the schedule or not?

A. Correct.

Q. How about if I say I can't work evenings due to a medical condition and the store manager determines that they can't give

Ana Klancic

me a schedule with no evenings; are they supposed to partner with human resources, with you, with anybody before making the decision based on your understanding of the accommodation process?

A. No.

Q. Okay. So a store manager could simply say, no, we're not going to give you that medical accommodation based on your understanding of Express's policies?

A. Correct.

Q. Okay. Did the store manager, based on your understanding of Express's policies, evaluate the medical documentation to determine whether it was needed or not? How about if there's an issue as to whether or not I truly cannot work evenings; is that solely the responsibility of the store manager?

A. No.

Q. Okay. What would the store manager do? If the store manager had an issue, what in your understanding was the store manager required to do?

05/23/2007 19:58 FAX 202 659 1027    BIRCH HORTON BITTNER    ☒008/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 8 of 19

Page 54

Ana Klancic

her over that period?

    A. Those dates to me, I don't know. Like I can't remember what those dates are. I mean, I obviously talked to Paula Pagonakis. She was one of my assistant managers, co-manager, but I don't remember dates.

    Q. Okay. And I guess the key point of my question is, Ms. Pagonakis says that she didn't talk to you essentially -- she didn't talk to you from February 3, 2004 until her resignation. Do you have any reason to disagree with that?

    A. I really don't recall.

    Q. Okay. So you don't recall any conversations that took place during that period?

    A. No, I don't.

    Q. Okay. Now, Ms. Pagonakis transferred from an Ohio store to Delaware. When did you first come into contact with Ms. Pagonakis from your recollection?

    A. When I got promoted to the district manager she was already a sales associate in

```
 1                    Ana Klancic
 2   provided to Ms. Pagonakis is when the
 3   discussion of her promotion into a brand
 4   sales leader position took place?
 5        A.   I think I knew prior to that as
 6   well.
 7        Q.   Do you have a specific recollection
 8   or you just think that you somehow became
 9   aware of it?
10        A.   I think -- I'm not 100 percent
11   sure, but I remember us -- I talked to
12   Kristyn Bosley about it because she was one
13   of our top associates, so we obviously
14   discussed our associate team.  And I remember
15   her, I think, saying that, you know, this was
16   her schedule because of the disability and we
17   were accommodating to her because she was a
18   good sales associate.
19        Q.   Okay.  You mentioned disability.
20   Did Ms. Bosley actually tell you that this
21   was due to medical issues or did she just
22   tell you this was a schedule that she had to
23   work?  Do you understand the distinction?
24        A.   Yes.  I don't remember.
25        Q.   Okay.  Did you ever have any
```

05/23/2007 19:59 FAX 202 659 1027    BIRCH HORTON BITTNER    ☒010/019
Case 1:06-cv-00027-SLR    Document 56-7    Filed 05/23/2007    Page 10 of 19

Page 59

1         Ana Klancic
2  discussions directly with Ms. Pagonakis as to
3  what her physical or mental condition was
4  that caused her to need to work this shift?
5      A.   Yes.
6      Q.   When did that conversation take
7  place?
8      A.   I don't recall.
9      Q.   Well, she resigned in March 2004.
10 Would it have been close in time to the
11 resignation or would it have been when we're
12 talking about these -- closer in time to
13 promotions to brand sales lead?
14     A.   It was closer to her resignation.
15     Q.   What do you recall from that
16 conversation?
17     A.   I was -- at the time we were
18 eliminating a lot of special schedulings with
19 the company, and human resources -- I'm not
20 sure who that person was at the time.  I
21 think also with Scott Miller; he was our
22 regional vice president.  We were eliminating
23 a lot of the special positions in scheduling,
24 and then Paula Pagonakis came up of why she
25 worked a special schedule.  You know, I

```
 1                    Ana Klancic
 2      A.    That's correct.
 3      Q.    Okay.  Now, prior to this
 4   conversation -- we'll get into that
 5   conversation and what you did after that
 6   conversation.
 7            MR. BAILEY:  Object to the
 8      form.  This conversation --
 9            MR. CAMPBELL:  Okay.  I'll be
10      a little more specific.
11   BY MR. CAMPBELL:
12      Q.    Prior to the discussions about
13   Express's decision to eliminate special
14   schedules, prior to that date was Ms.
15   Pagonakis always accommodated to your
16   knowledge?
17      A.    Yes.
18      Q.    And did you make the decision with
19   Ms. Bosley to promote Ms. Pagonakis to the
20   brand sales lead position?
21      A.    Along with our regional manager.
22      Q.    Okay.  Was that a part-time or
23   full-time position?
24      A.    Full-time.
25      Q.    And did Ms. Pagonakis work
```

05/23/2007 20:00 FAX 202 659 1027    BIRCH HORTON BITTNER    ☒012/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 12 of 19

Page 62

                Ana Klancic

1      
2  full-time hours, if you recall?
3     A.   She did some work for me from home,
4  but it did come to 40 hours total by the end
5  of the week.
6     Q.   So in the store she would work less
7  than 40 hours?
8     A.   In some occasions.
9     Q.   Okay. And if she worked less than
10 40 hours in the store, she would pick up
11 hours at home?
12    A.   Yes.
13    Q.   Did you have any other employees in
14 your district at any time that were permitted
15 to work at home --
16    A.   No.
17    Q.   -- when you were district manager,
18 just so I'm clear?
19    A.   No.
20    Q.   Okay. Why did you permit Ms.
21 Pagonakis to work from home?
22    A.   Because she wasn't able to drive in
23 the fog or rainy days, and the regional
24 manager was aware of this.
25    Q.   Aware of Ms. Pagonakis being

Page 74

Ana Klancic

2  Q. The reason for her resignation, or
3  are you assuming that?
4  A. She did not tell me that.
5  Q. Okay. So you're just guessing as
6  the reason for her resignation?
7           MR. BAILEY: Object to the
8     form.
9           THE WITNESS: Correct.
10 BY MR. CAMPBELL:
11 Q. As we sit here today, your
12 recollection is that the only documents that
13 Ms. Pagonakis provided were either the
14 Internet documents or other medical records
15 that were insufficient to support her
16 accommodation request?
17 A. That's correct.
18 Q. And so from the point in time when
19 Express prohibited the special schedules, the
20 work-at-home or other special schedules, is
21 it your recollection that Ms. Pagonakis's
22 request for an accommodated schedule was not
23 granted?
24 A. That's correct.
25 Q. Okay. And so Ms. Pagonakis, to the

05/23/2007 20:00 FAX 202 659 1027    BIRCH HORTON BITTNER    ☑014/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 14 of 19

Page 75

Ana Klancic

2  best of your recollection, was required to
3  work mornings and evenings and on days when
4  the weather was bad during that timeframe?
5     A.   Yes.
6     Q.   Do you recall Jennifer Hinkle or
7  the human resources department giving the
8  Christiana Mall store additional hours to
9  work with in order to accommodate this
10 schedule?
11    A.   No.
12    Q.   And along the lines of the
13 resignation, let me just ask you this:  You
14 recall a conversation about the Internet
15 documents with human resources about whether
16 the accommodation would be provided, correct?
17    A.   Yes.
18    Q.   Do you recall any other discussions
19 with either Ms. Pagonakis or human resources
20 after that date where the accommodations were
21 addressed?
22              MR. BAILEY:  Object to the
23    form.
24              THE WITNESS:  No.
25 BY MR. CAMPBELL:

1                    Ana Klancic
2        A.   Correct.
3        Q.   So was it your understanding that
4   Paula -- during her tenure under your
5   supervision while you're district manager
6   that Paula Pagonakis never opened the store
7   on a regular basis?
8        A.   I don't remember.
9        Q.   Okay. How about closing the store
10  during the night hours? Is your recollection
11  that she regularly closed the store?
12       A.   She did do it a few times.
13       Q.   But not on a regular basis?
14       A.   No.
15       Q.   C is not assigning Paula tasks that
16  called for climbing. Do you recall that
17  accommodation?
18       A.   Yes.
19       Q.   Okay. When do you recall learning
20  of that need for accommodation?
21       A.   From the beginning.
22       Q.   Okay. And scheduling Paula for a
23  day off every three or four days, when did
24  you learn of that?
25       A.   From the beginning.

05/23/2007 20:01 FAX 202 659 1027   BIRCH HORTON BITTNER   ☑016/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 16 of 19

Page 114

1                    Ana Klancic
2        A.    Yes.
3        Q.    Okay.  Now, why do you say that?
4        A.    So I'd know what was going on with
5   Paula's -- if she was coming back or what the
6   response was from human resources to me on
7   what to say to her when she came back or if I
8   needed anything from her.
9        Q.    Paula was doing a good job for you,
10  wasn't she?
11       A.    Yes.
12       Q.    You liked Paula working there?
13       A.    Yes.
14       Q.    There were a lot of co-managers,
15  weren't there?
16       A.    Yes.
17       Q.    A good number of them?
18       A.    Yes.
19       Q.    It's fair to say that some of those
20  co-managers didn't like the accommodations
21  that Paula got; isn't that true?
22       A.    That's correct.
23       Q.    And some of them let Paula know it,
24  didn't they?
25       A.    Yes.

Ana Klancic

Q. Who's Jennifer Hinkle?

A. Another human resources representative.

Q. So there were a lot of human resource representatives working on this case, weren't they?

A. That's why I don't know who I spoke to.

Q. So it was one of the people that were in here (indicating)?

A. Yes.

Q. Okay. You mentioned that you thought Paula was a good worker. She was pretty much able to do every function of her job, wasn't she?

A. Yes, except climb ladders or lift heavy things.

Q. And a co-manager's job isn't just to -- she's not a ladder climber, right?

A. Correct.

Q. I mean, that might be incidental to the job, but it's not the main function of the job, right?

A. Correct.

05/23/2007 20:02 FAX 202 659 1027    BIRCH HORTON BITTNER    ☒018/019
Case 1:06-cv-00027-SLR   Document 56-7   Filed 05/23/2007   Page 18 of 19

Page 116

1                     Ana Klancic
2     Q.    So if she can't climb a ladder, she
3  could still be a functional and effective
4  co-manager; is that fair to say?
5     A.    Absolutely, yes.
6     Q.    Do you know if other co-managers
7  were operating under a disability similar to
8  Paula's?
9     A.    No, they were not.
10    Q.    Okay.  So when the defendant says
11 that no other co-manager was given schedules
12 like Paula, no other co-manager needed a
13 schedule like Paula; is that fair to say?
14    A.    Yes.
15              (Document marked Deposition
16    Exhibit 9 for identification.)
17 BY MR. BAILEY:
18    Q.    Ms. Klancic, I've just handed you
19 what the reporter has marked as Exhibit 9.
20 On the bottom right-hand corner it says
21 Express-Pag 000039.  It's an e-mail string
22 that begins Friday, December 26th, 2003 at
23 4:46 p.m.  Could you please take a moment to
24 review this entire document?
25    A.    (Witness complies.)  Okay.

```
 1                    Ana Klancic
 2      Q.   When you, as you read these today,
 3  are you confused as to who was supposed to
 4  provide the accommodation for Paula?
 5      A.   I knew it was human resources.
 6      Q.   Well, you knew it.
 7      A.   Yes.
 8      Q.   Do you know if human resources
 9  ultimately made an accommodation for Paula?
10            MR. CAMPBELL:  I'm going to
11      object.  She's already answered the
12      question.
13            THE WITNESS:  No, they did
14      not.
15  BY MR. BAILEY:
16      Q.   They didn't?
17      A.   No.
18      Q.   All right.  And that would be
19  despite the medical documentation that we
20  know she provided; is that right?
21      A.   That's correct.
22      Q.   Okay.  Now, you had mentioned
23  earlier that there had been -- separate from
24  you, I understand there may have been
25  discrimination complaints filed at the store;
```