IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PAULA PAGONAKIS,                        )
                                        )
            Plaintiff,                  )
                                        )
    v.                                  ) Civ. No. 06-027-SLR
                                        )
EXPRESS, LLC, a/k/a                     )
LIMITED BRANDS, INC.,                   )
                                        )
            Defendant.                  )

---

Gary W. Aber, Esquire of Aber, Goldlust, Baker & Over, Wilmington, Delaware. Of Counsel: James B. Bailey, Esquire, and Jason H. Ehrenberg, Esquire of Bailey & Ehrenberg PLLC. Counsel for Plaintiff.

Francis G.X. Pileggi, Esquire and Sheldon K. Rennie, Esquire of Fox Rothschild LLP, Wilmington, Delaware. Of Counsel: David A. Campbell, Esquire and Lori L. Fauvie, Esquire, of Vory, Sater, Seymour and Pease LLP, Cleveland, Ohio. Counsel for Defendant.

---

**MEMORANDUM OPINION**

February 14, 2008
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On January 13, 2006, plaintiff Paula Pagonakis ("Pagonakis" or "plaintiff") filed

the present complaint against defendant Express, LLC, a/k/a Limited Brands ("Express"

or "defendant"), alleging three counts: (1) discrimination under the Americans with

Disabilities Act of 1990 ("ADA"); (2) retaliation under the ADA; and (3) retaliation under

the Family and Medical Leave Act ("FMLA"). (D.I. 1) Presently before the court are

defendant's motions for summary judgment (D.I. 51) and partial summary judgment

based on alleged procedural deficiencies (D.I. 49).[1] For the reasons set forth below,

the court will grant defendant's motion for summary judgment, and the court will deny

defendant's motion for partial summary judgment.

## II. BACKGROUND

### A. Facts Relating to Plaintiff's Discrimination and Retaliation Claims

On April 12, 1995, plaintiff was involved in a car accident. (D.I. 56, ex. 2 at ¶ 2)

As a result, plaintiff sustained the following injuries: (1) closed head injury; (2) cognitive

disorder; (3) adjustment disorder with depressed mood; and (4) fibromyalgia. (Id. at ¶

---

[1]On June 18, 2007, the court granted plaintiff's motions to compel the production of evidence regarding defendant's: (1) other written ADA and FMLA discrimination complaints; (2) employee personnel files involving disciplinary action; and (3) former employee contact information. (D.I. 60) The parties have failed to supplement their summary judgment papers on or before August 13, 2007, and the parties have not brought any additional discovery issues to the attention of the court. (Id.) Notwithstanding, plaintiff in her opposition brief requested an inference that defendant's failure to produce certain employee files was out of fear that the information was harmful. The court will not grant plaintiff's requested evidentiary inference on the grounds that plaintiff failed to bring any discovery issues to the attention of the court prior to the August 13, 2007 deadline. The court will render judgment based on the current record.

1) In connection with her closed head injury, plaintiff suffers from visual impairments causing her disorientation, or loss of equilibrium, when exposed to visual stimuli such as bright or moving lights. (Id. at ¶ 3) Furthermore, plaintiff suffers from pain in multiple areas of her body due to her fibromyalgia. (Id.) Plaintiff's mental and physical impairments impede processing of auditory and visual information, thus, restricting her ability to think, hear, see, work and drive. (Id. at ¶ 4) Defendant disputes plaintiff's alleged disabilities. (D.I. 3 at ¶¶ 6-8; D.I. 51, ex. A at ¶ 14)

In November of 1997, over two years after the accident, defendant hired plaintiff at its Express store located in Ohio as a part-time sales person. (D.I. 56, ex. 2 at ¶ 4) Plaintiff claims that, during her job interview, she informed defendant of her physical and mental impairments and provided the "[d]efendant with relevant medical information." (Id. at ¶ 5) Defendant permitted plaintiff to have daylight working hours and a flexible work schedule. (Id.) In June 2000, plaintiff transferred to a different Express store located at the Christiana Mall in Newark, Delaware as a part-time sales associate. (Id. at ¶ 6) According to plaintiff, her personnel file, including information about her "disabilities and necessary accommodations," were transferred to the Christiana Mall Express. (Id.) In contrast, defendant claims that plaintiff never notified Express about her specific physical or mental impairments, rather, only her requested accommodations. (D.I. 51, ex. E at 90, 96; D.I. 51, ex. A at ¶ 14)

Ana Klancic ("Klancic") was the district manager at the Christiana Mall Express store during plaintiff's employment period. (D.I. 56, ex. 4 at ¶ 2) Klancic testified that she was aware that plaintiff "suffered from medical conditions/disabilities that necessitated certain accommodations in the workplace." (Id. at ¶ 3) These

3

accommodations included allowing plaintiff: (1) to take periodic daily breaks; (2)
daylight working hours; (3) to forgo climbing tasks; (4) an intermittent day off every three
or four days; and (5) to temporarily work from home. (Id.) With respect to plaintiff's
flexible work schedule, she testified that her work hours changed daily according to the
seasonal changes and the amount of daylight hours available in the day. (D.I. 51, ex. B
at 104) According to plaintiff, "[Y]ou get less time until the [twentieth] and more time
after the [twentieth.] Once you hit the solstice your daylight hours are longer again."
(Id. at 105) Plaintiff states "I looked every single day when the sun rose and when the
sun set . . . and timed myself to have a half an hour to get to and from work." (Id. at
104.) In addition, plaintiff was allowed to arrive late to work because she was not able
to drive if it was snowing or raining hard, foggy or sleeting and would "not be able to
drive until the fog usually cleared." (Id. at 105)

     In March 2002, Klancic promoted plaintiff to the full-time position of brand sales
leader; the above-mentioned accommodations continued. (D.I. 56, ex. 2 at ¶ 12)
Klancic testifies that, during the time plaintiff was a brand sales leader, she completed a
forty-hour work week, albeit working some of those hours from home. (D.I. 56, ex. 6 at
62) Elise Zapp ("Zapp") was a co-manager at the Christiana Mall store and supervised
plaintiff. (D.I. 56, ex. 5 at 11) Plaintiff alleges that Klancic, Zapp, and other store
employees made derogatory remarks about her disabilities and, specifically, that she
was not "management material." (D.I. 56, ex. 2 at ¶ 13) Zapp denies that she made
derogatory remarks about plaintiff's disabilities, but she admits that "other employees
and managers made statements that she was not management material because of her
inability to work regular hours." (D.I. 56, ex. 5, at 35) Plaintiff complained to Klancic

                                          4

complained to Klancic about these remarks and Klancic told her to "just go along with it, not [to] ruffle feathers, and try to find a way to avoid [the other employees] making comments." (D.I. 56, ex. 2 at ¶ 14)

In June 2003, Klancic promoted plaintiff to co-manager of the Christiana Mall store. (D.I. 56, ex. 4 at ¶ 4) Klancic testified that she was motivated to continue plaintiff's workplace accommodations because she was an asset to the team. (Id.) Plaintiff continued to receive the same workplace accommodations until November of 2003. (D.I. 56, ex. 2 at ¶ 19) Plaintiff asserts, however, that she did not receive appropriate training for the co-manager position. (Id. at ¶ 17) In particular, plaintiff did not receive training for the cash registers or receive keys to unlock the store. (Id. at ¶ 18)

In the fall of 2003, Klancic's direct supervisors and defendant's human resources department instructed her to cease plaintiff's accommodations until plaintiff provided medical documentation of her disability. (D.I. 56, ex. 4 at ¶ 5) Klancic had previously authorized plaintiff's accommodations without the approval of defendant's human resources department. (D.I. 51, ex. E at 65) As a result of defendant's revocation of plaintiff's accommodations, she was now sometimes required to work evening shifts. (D.I. 56. ex. 6 at 75) Plaintiff contends that defendant intentionally changed managerial meetings from mornings to evenings to prevent her from attending. (D.I. 56, ex. 2 at ¶ 20) Furthermore, plaintiff states that the defendant often required her to work from 8:00 a.m. to 4:00 p.m. without breaks and scheduled her to work five to six days consecutively. (Id.) According to plaintiff, defendant now assigned her tasks involving climbing. (Id.)

5

The defendant states the "essential funtion[s] of the [c]o-[m]anager position is the ability to work on a full-time basis, or forty hours a week in the store, and to be available to open and close the store." (D.I. 51, ex. A at ¶ 5) Klancic testified that plaintiff was unable to close the store "on a regular basis." (D.I. 51, ex. E at 95) In addition, plaintiff was unable to work a forty hour week in the store. (Id. at 62) Defendant claims that, as a result of plaintiff's prior accommodations, her co-workers had to work more often and longer. (Id. at 99-102)

Plaintiff states that, during a meeting on November 25, 2003, Tara Kessler ("Kessler"), a regional human resources associate for defendant, informed her that defendant would no longer continue to provide her with accommodations because "the person that had previously authorized the accommodations, Klancic, allegedly did not have authority to do so."² (D.I. 56, ex. 2 at ¶ 21) Plaintiff informed Kessler that she submitted medical records to Klancic in the past, and then attempted to submit medical records directly to Kessler at the meeting. (D.I. 56, ex. 10 at 1) Kessler refused to accept plaintiff's medical records and instructed plaintiff to call the defendant's human resources department within twenty-four hours in order to provide documentation and negotiate accommodations. (Id.) Plaintiff states that, despite contacting the defendant's human resources department and her best efforts, she was not able to determine to whom to submit her medical documentation. (D.I. 56, ex. 2 at ¶ 23)

On December 9, 2003, plaintiff took family medical leave due to stress, exhaustion, and fatigue stemming from the defendant's failure to accommodate her

---

²In addition, plaintiff asserts defendant lost her personnel files validating her disabilities and need for accommodations. (Id.)

disabilities. (Id. at ¶ 24)  When plaintiff returned to work on December 23, 2003, she submitted medical documentation from her physician outlining her need for workplace accommodations, which invited the defendant to contact Dr. Badillo for additional questions. (D.I. 56, ex. 11)  Defendant states that the December 23, 2003 "medical records consisted of a one-page list of requested accommodations."[3]  (Id. at 12; D.I. 51, ex. B at ex. 3)

From the time plaintiff arrived back to work on December 23, 2003, and through January 2004, plaintiff alleges that Kristen Bosley ("Bosley"), a Christiana Mall store manager (D.I. 56, ex. 5 at 8), Zapp and other supervisors and co-managers treated her in a disparaging manner by making rude remarks and chastising other employees for speaking with her. (D.I. 56, ex. 1 at 81, 109, 150-51; D.I. 56, ex. 7 at ¶ 6)  Furthermore, plaintiff testifies that other employees continually made offhanded comments such as "oh, is the weather nice for you" and "it would be nice if I could not have to do this or that." (D.I. 56, ex. 1 at 150)  In addition, according to plaintiff, an incident occurred in the store in which Zapp and Bosley mocked her and made fun of her jewelry. (Id. at 151-52)  Plaintiff also alleges that Klancic, Bosely, and Zapp made snide remarks to her, that she cannot specifically remember, in retaliation for taking FMLA leave, and often overturned her instructions to subordinates causing her embarrassment. (Id. at 91; D.I. 56, ex. 7 at ¶ 6; D.I. 56, ex. 9 at ¶ 4)  Although plaintiff was aware of defendant's open door complaint policy and the ethics hotline, she never submitted an

---

[3]Dr. Badillo writes in the one page letter that plaintiff "needs the following accommodations with her job:" daylight work hours; well lit work area; no climbing; no wet work place; periodic breaks as provided by law; and intermittent days off every three to four days.  (D.I. 51, ex. A)

official complaint of discrimination or harassment to defendant. (D.I. 51, ex. B at 184)

Jennifer Hinkle ("Hinkle"), a human resources manager for defendant (D.I. 51, ex. A at ¶ 1), after conferring with Klancic, decided that "although plaintiff did not provide medical documentation sufficient to support her accommodation request . . . Express ultimately determined that it would provide the requested accommodations because [p]laintiff had been accommodated in this manner for several years" (Id. at ¶ 13, ¶ 14). In fact, plaintiff testified that she was allowed certain accommodations starting again in January 2004. (D.I. 51, ex. C at 35-36) For example, plaintiff acknowledges days during that time period in which she was permitted to start work late when the weather was bad without reprimand. (Id.) Defendant offers further evidence that plaintiff was accommodated starting in January 2004 in that Hinkle increased the store's payroll budget so that defendant could afford to pay other co-managers to cover the hours plaintiff did not work. (D.I. 51, ex. A at ¶ 15; D.I. 51, ex. G at 38-39)

On February 3, 2004, plaintiff took a second FMLA leave. (D.I. 56, ex. 2 at ¶ 27) Plaintiff states that this leave was due to her supervisors' harassing comments and failure to reinstate her workplace accommodations. (Id.) Plaintiff claims that defendant refused to discuss her accommodations during her second FMLA leave. (D.I. 56, ex. 1 at 162-163) On February 17, 2004, plaintiff's physician extended her leave of absence allegedly due to her distress and mental fatigue resulting from her lack of accommodations and disparate treatment. (D.I. 56, ex. 2 at ¶ 29)

At the end of her leave of absence, plaintiff requested from defendant a non-medical extension to give her time to locate a new residence in Virginia, which defendant refused. (D.I. 51, ex. C at 52-54) Plaintiff's physician, Dr. Badillo, released

8

her to return to work without restriction on March 18, 2004, but she never returned to work on or after March 18, 2004. (D.I. 51, ex. B at 181)  Plaintiff testified that she was house hunting in Virginia on March 18, 2004. (D.I. 51, ex. C at 54)

 Plaintiff claims she was forced to resign from Express because defendant:  (1) failed to locate her lost personnel file; (2) did not contact Dr. Badillo to verify her disabilities and accommodations; (3) did not communicate with her directly about her workplace accommodation request; (4) made no effort to reasonably accommodate her; and (5) created a hostile work environment. (D.I. 56, ex. 2 at ¶ 30, ¶ 31)

## B. Procedural History

On January 30, 2004, plaintiff filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 49, ex. A at ex. 5) Plaintiff did not allege constructive discharge at that time because she was still employed at Express. (Id.) In addition, plaintiff did not claim harassment or retaliation. (Id.) The original charge addresses only disability discrimination and, specifically, a failure to accommodate.[4] (Id.) On September 28, 2005, plaintiff filed an amended charge with the EEOC, further alleging that she was forced to resign because of continuing discrimination and defendant's failure to provide accommodations.[5] (Id. at ex. 6) Defendant asserts that, because the charge addresses solely disability discrimination, it was not afforded the opportunity to address plaintiff's allegations of

---

[4]Plaintiff states in the original charge document, "I believe that I am being discriminated against (denied reasonable accommodations) because of my disability." (D.I. 51 ex. B, ex. 6)

[5]The original and amended charge lists plaintiff's Delaware address. (D.I. 49, ex. A at 124-25)

9

harassment or retaliation.  (D.I. 49, ex. B at ¶ 4)  Plaintiff testified she lived at her

Delaware address at the time she submitted both the original and amended charges.

(D.I. 49, ex. A at 124-25)

The EEOC sent the right to sue letter to plaintiff on October 5, 2005 to her

Delaware address.  (D.I. 55 at ¶ 12)  Defendant alleges that plaintiff confirmed with the

EEOC that this was her correct address at the time.  (D.I. 49, ex. A at 124-25)  In

contrast, plaintiff claims that she moved to Charlottesville, Virginia in September of

2005.  (D.I. 55, ex. 1 at ¶ 6)  Plaintiff testified that she notified the EEOC of her new

address on or before September 21, 2005 (D.I. 55, ex. 3) and the record shows the

EEOC mailed the amended charge to plaintiff's address in Charlottesville, Virginia on

September 21, 2005 (D.I. 55, ex. 4).  Defendant argues that plaintiff's EEOC file does

not contain evidence of a permanent address change.  (D.I. 49, ex. B at ¶ 8)

Defendant received the amended charge, stating no response was required, on

approximately October 11, 2005, six days after the EEOC issued the right to sue letter

to plaintiff.  (D.I. 49, ex. B at ¶ 5)  As a result, defendant alleges that it was not afforded

the opportunity to respond to the allegations in the amended charge.  (Id. at ¶ 6)  The

U.S. Postal Service did not forward the right to sue letter to plaintiff's Virginia address

until October 11, 2005.  (Id.)  Plaintiff states she received the right to sue letter in

Charlottesville, Virginia on October 17, 2005, six days after it was properly addressed.

(D.I. 55, ex. 1 at ¶ 14)  Plaintiff filed this civil action on January 13, 2006.  (D.I. 1)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. Partial Summary Judgment

#### 1. Ninety day filing period

Defendant argues that plaintiff failed to file her complaint within the required ninety-day statutory filing period, subsequent to her receipt of the EEOC right to sue letter. 42 U.S.C. § 2000e-5(f)(1) (2008). "When the receipt date of the right to sue letter is in dispute, and there is not evidence pertaining to when the letter was actually received, Rule 6(e) of the Federal Rules of Civil Procedure will control by invoking the presumption of receipt within three days of mailing. Arots v. Salesianum Sch., Inc., No. 01-334 GMS, 2003 WL 21398017, at *2 (D. Del. June 17, 2003) (citing Seitzinger v. Reading Hosp. and Med. Ctr., 165 F.3d 236, 239 (3d Cir. 1999)). The EEOC undisputedly mailed the right to sue letter on October 5, 2005, and plaintiff claims to have received the letter twelve days later on October 17, 2005. (D.I. 49, ex. A at 120; D.I. 55 at ¶ 12) Plaintiff filed her instant complaint on January 13, 2006. If the three day presumption is applicable she would have exceeded the ninety-day filing period by seven days. Therefore, plaintiff must show sufficient evidence that she received the right to sue letter on October 17, 2005 to rebut the three day presumption.

Plaintiff offers the following probative evidence that she received the right to sue letter on October 17, 2005: (1) plaintiff's new Virginia address appears in the EEOC investigator's notes dated September 21, 2005 (D.I. 55 at ex. 3); (2) the EEOC mailed plaintiff's right to sue letter to her Delaware address; (3) the U.S. Postal Service readdressed and forwarded the right to sue letter to her Virginia address on October 11,

2005; (4) the EEOC had previously sent plaintiff the amended charge correctly addressed to her Virginia address on September 21, 2005 and it had taken six days to arrive; and (5) plaintiff swears under penalty of perjury that she had noted, at the time of receipt, on the envelope of the right to sue letter "Took out of my mailbox on [October 17, 2005]" (Id. at ex. 5)  Therefore, plaintiff provides sufficient evidence upon which a reasonable jury could find that she received the EEOC right to sue letter on October 17, 2005, thus, satisfying the ninety-day statutory filing period.

### 2. Exhaustion of administrative remedies

Defendant claims that plaintiff failed to exhaust her administrative remedies for the charges of harassment,[6] retaliation, and constructive discharge.  Specifically, defendant argues that plaintiff cannot maintain an action for retaliation or constructive discharge because the EEOC never investigated these allegations.  42 U.S.C. § 2000e-5(b) (2008).  However, the EEOC's failure to investigate a charge "does not bar a civil suit by the charging party."  Hicks v. ABT Associates, Inc., 572 F.2d 960, 964 (3d Cir. 1976).  Furthermore, plaintiff's charges of retaliation and constructive discharge "can reasonably be expected to grow out of the charge of discrimination" because of the close nexus of supporting facts.  Id. at 967.  In addition, absent from the record is any evidence pertaining to the EEOC's investigatory methods that could lead a reasonable jury to decide in defendant's favor.  Therefore, defendant has not shown the absence of an issue of material fact with respect to plaintiff's exhausting her administrative

---

[6]Plaintiff does not assert in her complaint a charge of harassment under the ADA, but argues harassment as a basis for her retaliation and constructive discharge claims; therefore, the court need not consider harassment for summary judgment. (D.I. 3)

13

remedies.

## B. Count I - Discrimination under the ADA

To raise a claim for relief under the ADA, plaintiff must first establish a prima

facie case of discrimination by showing that: "(1) [s]he is a disabled person within the

meaning of the ADA;[7] (2) [s]he is otherwise qualified to perform the essential functions

of the job, with or without reasonable accommodations by the employer; and (3) [s]he

has suffered an otherwise adverse employment decision as a result of discrimination."

Gaul v. Lucent Technologies, Inc., 134 F.3d 576, 580 (3d Cir. 1998). If plaintiff

establishes a prima facie case of discrimination, the burden then shifts "to the employer

to articulate some legitimate, nondiscriminatory reason" for the adverse employment

action. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).

"If the defendant meets this burden, the presumption of discriminatory action

raised by the prima facie case is rebutted." Tex. Dep't. of Cmty. Affairs v. Burdine, 450

U.S. 248, 254-55 (1981). However, plaintiff is "afforded a fair opportunity to show that

petitioner's stated reason" for the adverse employment action was in fact a pretext.

McDonnell Douglas, 411 U.S. at 804. Plaintiff must submit evidence that casts doubt

on each legitimate reason proffered by the defendant to allow an inference that

---

[7]Defendant disputes plaintiff's alleged disability in its answer, but does not offer substantive evidence in its answer or summary judgment papers to disprove a genuine issue of material fact on plaintiff's disability. Plaintiff must show that her disability substantially limits a major life activity. 29 C.F.R. § 1630.2(g) (2007). Specifically, plaintiff testified that her alleged closed head injury limits her ability to think, hear, see, work and drive. (D.I. 56, ex. 2 at ¶ 2) Furthermore, Dr. Badillo defined plaintiff's disability as a "traumatic brain injury." (D.I. 56, ex. 10 at ex. 3) After considering the facts in the light most favorable to plaintiff, the court concludes that a genuine issue of material fact exists as to whether plaintiff suffers from a closed head injury that substantially limits one or more major life activities.

14

"discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

## 1. Essential functions of the co-manager position

"[T]he burden is on the employee to prove that [s]he is an otherwise qualified individual." Shiring v. Runyon, 90 F.3d 827, 832 (3d Cir. 1996). First, to qualify under the ADA, plaintiff must show that she "satisfies the requisite skill, experience, education and other job-related requirements[8] of the position that such individual holds or desires." Conneen v. MBNA America Bank, N.A., 334 F.3d 318, 326 (3d Cir. 2003). Second, plaintiff must then establish that she can perform the essential functions of the job sought or held with reasonable accommodations. Id. "The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. pt. 1630, app. § 1630.2(n)(1) (2008). "The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. pt. 1630, app. § 1630.2(n)(2)(ii).

The relevant factors in determining the essential job functions of the co-manager position are: "(i) [t]he employer's judgment as to what functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; [and] (iv) [t]he consequences of not requiring the incumbent to perform the function." Skerski v. Time Warner Cable Co., 257 F.3d 273, 279-80 (3d Cir. 2001). In addition, another important

---

[8]Defendant does not dispute that plaintiff has the ability to perform her duties or has the education, experience or skill required for the co-manager position.

15

factor in determining an essential job function is "the employee's actual experience as well as that of other employees." Id.; see also Conneen, 334 F.3d at 326 ("[T]he employee's actual experience is also relevant to the inquiry.").

### a. Ability to work forty hours per week in the store

Defendant argues that the ability to work forty hours a week in the store is an essential job function. Hinkle's affidavit outlines the essential functions for the co-manager position as "the ability to work on a full-time basis, or forty hours a week in the store" and that "[t]he [c]o-manager position is not a home-based position."[9] (D.I. 51, ex. A at ¶ 5) In addition, Klancic testified that co-managers are expected to "work at least those [forty] hours and potentially more per week in order to maintain the budget." (D.I. 51, ex. E at 25) Deference is given to an employer's decision to schedule a minimum amount of hours per week for its management personnel. See Simmerman v. Hardee's Food Systems, Inc., No. CIV. A. 94-6906, 1996 WL 131948, at *7 (E.D. Pa. Mar. 22, 1996) (citing Guice-Mills v. Derwinski, 772 F. Supp. 188 (S.D.N.Y. 1991), aff'd, 967 F.2d 794 (2d Cir. 1992) (holding "[a]n employer must be given broad latitude in work scheduling and its administration, particularly regarding its professional, management

---

[9]The court considered evidence that, for the majority of plaintiff's employment, defendant allowed her to arrive late without penalty in inclement weather, and leave early to avoid driving at night, and make up any lost hours at home. (D.I. 56, ex. 2 at ¶ 12; D.I. 56, ex. 4 at ¶ 14) The court finds plaintiff's past accommodations solely allowed her to commute to work and are not related to the essential functions of the co-manager position. Cf. Skerski, 257 F.3d at 283 (holding "that a genuine issue of material fact exists as to whether climbing is an essential function of the job of installer technician" based on uncontradicted evidence that the employee put forth that "he worked for more than three years . . . without having to perform [climbing work]").

16

and supervisory personnel")).  Furthermore, as a consequence of not requiring plaintiff to work a forty-hour week in the store, defendant increased the Christiana Mall store's payroll budget enabling other co-managers to cover the hours that plaintiff did not work.  (D.I. 51, ex. G at 38-39)  Hinkle testified that "each store is budgeted a set number of work hours per week, [and] each employee holding these positions [store manager and co-manager] is expected to work full-time hours, or forty hours a week."  (Id. at ¶ 4)

Plaintiff's own past work experience in the co-manager position tends to show that working forty hours a week in the store is an essential job function of the co-manager position because she was scheduled each week to work forty hours in the store.  29 C.F.R. § 1630.2(n)(3)(vi); (D.I. 51, ex. B at 97-98; D.I. 51, ex. E at 102)  Importantly, plaintiff's salary was based on forty work hours per week.  (D.I. 51, ex. E at 102)  Even taking the facts in a light most favorable to plaintiff, the court finds that no reasonable jury could conclude that a forty-hour work week is not an essential job function of the co-manager position.

### b. Ability to open and close the store

Defendant argues the ability to open and close the store is an essential job function; Hinkle corroborates in her affidavit that a co-manager must "be available to open and close the store."  (D.I. 51, ex. A at ¶ 5)  Klancic testified that all other co-managers were required to regularly open and close the store.  (D.I. 51, ex. E at 99, 102)  The record shows that co-managers must open cash registers before the store opens to the public.  (D.I. 51, ex. C at 36)  Furthermore, the task of opening and closing the store was rotated weekly "[b]etween five to seven" co-managers.  (D.I. 56, ex. 5 at 9)  Typically, more than one co-manager was scheduled to open or close the store at

17

any one time. (D.I. 51, ex. E at 101-102)  Co-managers must perform duties

approximately two hours before the store opens to the public and similarly after the

store closes. (Id. at 28)  Other co-managers had to work more often and harder to

cover for plaintiff's inability to open and close the store, and Klancic received

complaints from other co-managers in this regard. (Id. at 67, 97)

Plaintiff argues that, because the ability to open and close the store is not an

essential job function, she was never trained as a co-manager or given a full set of

keys. (D.I. 56, ex. 1 at 100, 205)  Plaintiff submitted affidavits from employees of

Express stating that plaintiff did not receive full co-manager training or a full set of keys.

(D.I. 56, ex. 7 at ¶ 3; D.I. 56, ex. 9 at ¶ 6)  Notwithstanding, the record shows that

plaintiff was not capable of arriving on time to perform the specific tasks involved in

opening the store in a punctual manner, or close the store after dark.  The court finds

plaintiff's evidence insufficient to demonstrate the ability to open or close the store is

not an essential function of defendant's retail store co-manager position.  See Earl v.

Mervyns, 207 F.3d 1361, 1366 (11th Cir. 2000) (finding an essential job function

because the employee's tasks "by their very nature must be performed daily at a

specific time" and tardiness would adversely affect the schedules of other employees).

### c.  The evidence does not indicate that plaintiff can perform these duties with reasonable accommodations

A reasonable accommodation under the ADA "enable[s] a qualified individual

with a disability to perform the essential functions of that position."  29 C.F.R. §

1630.2(o)(1)(ii).   "Plaintiff must make a prima facie showing that reasonable

accommodation is possible."  Donahue v. Consolidated Rail Corp., 224 F.3d 226, 229

(3d Cir. 2000). "If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable or would cause an undue hardship on the employer." (Id.)

In order to work forty hours a week and open and close the store, plaintiff asserts she requires the following accommodations:  daylight working hours; no climbing tasks; intermittent days off every three or four days; temporary work from home; late arrival, without penalty, on the account of fog, snow, or rain; and an early leave time to avoid driving home in the dark.  (D.I. 56, ex. 4 at ¶ 2; D.I. 51, ex. B at 104-107)  A reasonable accommodation includes "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 608 (3d Cir. 2006). By its nature, the co-manager position inherently requires punctuality in order for plaintiff to open and close the store.[10]  Thus floating start and leave times are not reasonable accommodations because they modify the essential function of the co-manager position.  See Donahue, 224 F.3d at 232 (holding employers are not required to modify essential job functions to accommodate employees).

_____

[10]Compare Earl, 207 F.3d. at 1356, 1364, 1367 (holding punctuality was an essential job function for the "store area coordinator" charged with opening her department in the morning, and that requiring the employer to permit her "to clock in at whatever time she arrived" was not a reasonable accommodation because it would change the essential functions of the job), with Conneen, 334 F.3d at 329 (finding the need for a manager to set a good example was not sufficient to prove punctuality is an essential function).

19

Plaintiff admits that she cannot always be punctual.[11]  Specifically, plaintiff testified that if there was fog, snow, or rain, she would start later than scheduled and make up missed hours at home by working on her computer.[12]  (D.I. 51, ex. C at 35-38) In addition, plaintiff testified that she would check every morning on her computer to ascertain when the sun would go down so she could leave a half hour before sunset. (Id. at 39)  Hinkle testified that, while most Express stores open at 9:00 a.m., plaintiff started many days at 10:00 a.m. or 11:00 a.m. and then left at 4:00 p.m, which did not equal an eight-hour work day and certainly not a forty-hour work week in the store.  (D.I. 51, ex. G at 40)  For the above mentioned reasons, plaintiff has not established a prima facie case under the ADA that she could perform the essential functions of the co-manager position with reasonable accommodations.[13]

---

[11]Employers are not required to grant accommodations to allow an employee to commute to work because the ADA solely addresses discrimination with respect to any "terms, condition or privilege of employment." Bull v. Coyner, No. 98 C 7583, 2000 WL 224807, at *9 (N.D. Ill. Feb. 23, 2000) (citing 42 U.S.C. § 12112); cf. Arbogast v. Alcoa Bldg. Products, No. 97-3626, 1998 WL 551933, at *2 (7th Cir. Aug. 27, 1998) (reasoning an employer may voluntarily choose to be helpful with respect to providing employees accommodations for commuting).

[12]Notably, plaintiff worked without her requested accommodations between November 25, 2003 and December 9, 2003.  (D.I. 56, ex. 2 at ¶ 21)  Plaintiff states that due to "[d]efendant's failure to reasonably accommodate my impairments, I suffered from extreme fatigue, exhaustion and stress and was forced to take [FMLA] leave on December 9, 2003." (Id. at ¶ 24)

[13]Plaintiff argues defendant failed to engage in the interactive process in determining a reasonable accommodation for her.  However, defendant need not engage in the interactive process because plaintiff failed to establish she was a qualified individual under the ADA. See Conneen, 334 F.3d at 330.

## 2. Adverse employment action and pretext

Notwithstanding, plaintiff also cannot establish a prima facie case because she has not demonstrated that she has suffered an adverse employment action as a result of discrimination under the ADA. Specifically, plaintiff alleges that defendant failed to provide her with reasonable accommodations for her disability,[14] and constructively discharged her from employment. The court must analyze constructive discharge under an objective standard in which "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984). To prove constructive discharge, plaintiff "must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Spencer v. Wal-Mart Stores, Inc., 469 F.3d 311, 317 (3d Cir. 2006). Factors in determining a hostile work environment are: "severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with the employee's work performance;" and the effect on plaintiff's psychological well being. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23 (1993). The alleged rude remarks, chastisements of other employees for speaking with her, and random incidents of overturning plaintiff's instructions to subordinates are not sufficiently intolerable in severity to compel a reasonable person to resign. The fact that plaintiff complained to Klancic about the offhanded comments directed toward her is not sufficient to show that defendant permitted a pervasive environment of

---

[14]The court has concluded, however, that plaintiff could not perform the essential job functions of the co-manager position without an unreasonable accommodation.

21

discrimination or harassment.[15]  (D.I. 51, ex. B at 184)  The record shows that plaintiff did not report any incidents of discrimination or harassment through defendant's official open-door complaint policy or ethics hotline, even though she had utilized the ethics hotline to report Bosley for allegedly working less hours than scheduled and stealing company time.  (D.I. 51, ex. D)  Therefore, plaintiff has not demonstrated that a genuine issue of material fact exists upon which a reasonable jury could find in her favor on the issue of constructive discharge.

Moreover, plaintiff cannot show that defendant's proffered reason for her termination was a pretext for a hidden discriminatory reason.  With respect to constructive discharge, the record reflects that plaintiff voluntarily submitted a letter of resignation to Express on the day that Dr. Badillo released her to return to work, March 18, 2004.  (D.I. 51, ex. B at ex. 4)  Notably, Dr. Badillo, in his release letter, did not recommend that defendant continue plaintiff's previous accommodations.[16]  (D.I. 51, ex. B at ex. 12)  The record is devoid of evidence showing pretext, thereby presenting no genuine issues of material fact for the jury to consider.

## C. Counts II & III- Retaliation under the ADA and FMLA

To establish a prima facie case of retaliation under the ADA "a plaintiff must show:  (1) protected employee activity; (2) adverse action by the employer either after

[15]Harris, 510 U.S. at 21 (finding a hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment").

[16]The record reflects the reason defendant revoked plaintiff's previous accommodations is that Express made a business decision to eliminate special schedules within the company.  (D.I. 51 ex. E at 59-61)

22

or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[17] Krouse, 126 F.3d at 500. As discussed above, plaintiff does not present questions of material fact on her adverse employment action claims, including failure to accommodate and constructive discharge. Furthermore, defendant's alleged conduct toward plaintiff including offhand comments, isolated incidents of chastisement of other employees for speaking with her, and the abdication of her authority, even when viewed in the light most favorable to plaintiff, are not sufficient for a reasonable jury to find discrimination or harassment.[18] Therefore, plaintiff's claims of retaliation fail under both the ADA and FMLA because she does not produce sufficient evidence to show that she suffered from an adverse employment action and that defendant's proffered reasons are pretextual.

## V. CONCLUSION

Based on the aforementioned reasons, the court denies defendant's motion for partial summary judgment (D.I. 49) and grants defendant's motion for summary

---

[17]Plaintiff must establish a prima facie case of retaliation under the FMLA by showing: (1) she took FMLA leave; "(2) [s]he suffered an adverse employment decision; (3) the adverse decision was causally related to [her] leave." Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004). The McDonnell Douglas burden shifting test govern retaliation under both the ADA and FMLA. See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997); Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004).

[18]Hamera v. County of Berks, No. 06-3518, 2007 WL 2745772, at *2 (3d Cir. Sept. 21, 2007) (noting "that a recurring point in harassment opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges in the terms or conditions of employment" (original alterations removed)).

judgment on all counts (D.I. 51).  An appropriate order shall issue.